ACCEPTED
01-15-00215-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/11/2015 11:58:13 AM
CHRISTOPHER PRINE
CLERK

## No. 01-15-00215-CR

In the
**Court of Appeals**
For the
**First District of Texas**
At Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/12/2015 8:16:13 AM
CHRISTOPHER A. PRINE
Clerk

———————◆———————

**No. 1411201**
In the 248th District Court
Of Harris County, Texas

———————◆———————

**JOSEPH BAILEY**
*Appellant*
V.
**THE STATE OF TEXAS**
*Appellee*

———————◆———————

**STATE'S APPELLATE BRIEF**

———————◆———————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**SARA SEELY**
Assistant District Attorney
Harris County, Texas

**GREG HOULTON**
Assistant District Attorney
Harris County, Texas

**JESSICA CAIRD**
Assistant District Attorney
Harris County Criminal Justice Center
1201 Franklin, Suite 600
Houston, Texas 77002
Telephone: 713.274.5826
Fax Number: 713.755.5809
State Bar Number: 24000608

ORAL ARGUMENT NOT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 9.4(g) and Texas Rule of Appellate Procedure 39.1, the State does not believe oral argument is necessary to resolve the issues on appeal.

## IDENTIFICATION OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), a complete list of the names of all interested parties is provided below.

*Counsel for the State:*

**Devon Anderson** — District Attorney of Harris County

**Jessica Caird** — Assistant District Attorney on appeal

**Sarah Seely & Greg Houlton** — Assistant District Attorneys at trial

*Appellant or criminal defendant:*

**Joseph Bailey**

*Counsel for Appellant:*

**Lana Gordon** — Counsel on appeal

**Mike Trent** — Counsel at trial

*Trial Judge:*

**Honorable Katherine Cabaniss** — Judge Presiding

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................i

IDENTIFICATION OF THE PARTIES ....................................................i

TABLE OF CONTENTS..................................................................ii

INDEX OF AUTHORITIES.............................................................vi

STATEMENT OF THE CASE............................................................1

STATEMENT OF FACTS .............................................................1

SUMMARY OF THE ARGUMENT ......................................................21

REPLY TO APPELLANT'S FIRST POINT OF ERROR......................................23

    I.   **The standard of review and applicable law on sufficiency and corroboration of accomplice testimony**....................................23

    II.   **The jury heard more than sufficient evidence to establish appellant's guilt apart from accomplice testimony**...............................25

        a.  The text messages connected appellant to the crime .........................26

        b.  Rose Preece's testimony connected appellant to the crime ...............26

        c.  Stella Preece connected appellant directly to the murder ..................28

        d.  The gas station surveillance photographs corroborated the accomplice witness testimony and tended to connect appellant to the crime ...............................................30

        e.  The firearms evidence tended to connect appellant to the crime........30

        f.  Appellant fled after the murder and hid from police .........................31

        g.  Appellant's motive to participate in the murder connected him.........32

h.  Considered as a whole, evidence outside of accomplice testimony tended to connect appellant to the murder ............................................33

REPLY TO APPELLANT'S SECOND POINT OF ERROR.................................33

*I. The standard of review and applicable law regarding charge error and accomplice witness instructions*.......................................34

*II. Stella was not an accomplice* ................................................36

a.  Stella was not an accomplice under Texas Penal Code Section 7.02(b) ............................................................................37

b.  Stella was not an accomplice under Texas Penal Code Section 7.02(a)(2) ..........................................................................39

*III.  Egregious harm did not result*..............................................42

*IV.  The jury charge correctly instructed on accomplice-witness law and applied the facts to the law* .........................................45

REPLY TO APPELLANT'S THIRD AND SIXTH POINTS OF ERROR............47

*I. The standard of review and applicable law* .................................48

*II.  The closing arguments* ......................................................48

a.  Guilt Phase ................................................................48

b.  Punishment Phase ........................................................52

*III. Appellant waived error to all of his guilt phase complaints*.................53

*IV.  Most of the prosecutor's guilty phase arguments were within the scope of proper summation* .............................................54

*V.  No harm resulted closing argument*.........................................56

a.  Guilty Phase ..............................................................56

     b.  Punishment Phase ........................................................................57

REPLY TO APPELLANT'S FOURTH POINT OF ERROR ................................59

*I. Testimony that appellant had been in prison* ............................60

*II.  The instruction and Ate's testimony cured the error* ............60

REPLY TO APPELLANT'S FIFTH POINT OF ERROR ....................................61

*I. The record does not support appellant's claims* .....................62

*II.  Appellant's misplaces his reliance on Oprean v. State* .........63

REPLY TO APPELLANT'S SEVENTH POINT OF ERROR .............................65

*I. The jury's requests and the testimony read back* ...................65

*II.  The read back testimony was responsive to the jury's question* ...........66

REPLY TO APPELLANT'S EIGHTH POINT OF ERROR ...............................67

REPLY TO APPELLANT'S NINTH POINT OF ERROR .................................69

*I. The standard of review and applicable law* ............................69

*II. Trial Counsel did not perform deficiently and his actions did not result in prejudice which undermined confidence in the outcome* .......69

     a.  The jury charge was not erroneous .....................................69

     b.  Trial counsel repeatedly objected to the gang evidence .....................70

REPLY TO APPELLANT'S TENTH POINT OF ERROR .................................71

*I.  Failure to request instruction to disregard waived error to Miller complaint* ................................71

*II. The Vernon Brooks complaint was unpreserved* .................73

PRAYER ..............................................................................................74

CERTIFICATE OF SERVICE ................................................................................75

CERTIFICATE OF COMPLIANCE .....................................................................76

# INDEX OF AUTHORITIES

**CASES**

*Abdnor v. State*,
871 S.W.2d 726 (Tex.Crim.App. 1994)................................................................34

*Aguirre-Mata v. State*,
992 S.W.2d 495, (Tex.Crim.App. 1999)..............................................................68

*Alejandro v. State*,
493 S.W.2d 230 (Tex.Crim.App. 1973)................................................................48

*Almanza v. State*,
686 S.W.2d 157 (Tex.Crim.App. 1984)................................................................34

*Arana v. State*,
1 S.W.3d 824 (Tex.App.—Houston
[14th Dist.] 1999, pet. ref'd) ..............................................................................73

*Barrios v. State*,
283 S.W.3d 348 (Tex.Crim.App. 2009).......................................................... 46, 47

*Blake v. State*,
971 S.W.2d 451 (Tex.Crim.App. 1998)................................................................35

*Bonier v. State*,
738 S.W.2d 726 (Tex.App.—Houston
[14th Dist.] 1989, no pet.) ..................................................................................48

*Brown v. State*,
870 S.W.2d 53 (Tex.Crim.App. 1994).......................................................... 66, 67

*Burks v. State*,
876 S.W.2d 877 (Tex.Crim.App. 1994)................................................................31

*Bustamante v. State*,
48 S.W.3d 761 (Tex.Crim.App. 2001)................................................................58

*Casanova v. State*,
383 S.W.3d 530 (Tex.Crim.App. 2012)................................................................42

*Cathey v. State*,
992 S.W.2d 460 (Tex.Crim.App. 1999)................................................................25

*Cocke v. State*,
201 S.W.3d 744 (Tex.Crim.App. 2006)................................................................35

*Cureton v. State*,
800 S.W.2d 259 (Tex.App.—Houston
[14th Dist.] 1990, no pet.) ......................................................................72

*Dickinson v. State*,
685 S.W.2d 320 (Tex.Crim.App. 1984).................................................48

*Doherty v. State*,
892 S.W.2d 13 (Tex.App.—Houston
[1st Dist.] 1994, pet. ref'd) ....................................................................72

*Druery v. State*,
225 S.W.3d 491 (Tex.Crim.App. 2007)..................................................25

*Easter v. State*,
536 S.W.2d 223 (Tex.Crim.App. 1976)..................................................35

*Erlandson v. State*,
763 S.W.2d 845 (Tex.App.—Houston
[14th Dist.] 1988, pet. ref'd) ..................................................................55

*Ex parte White*,
160 S.W.3d 46 (Tex.Crim.App. 2004)....................................................70

*Gamboa v. State*,
296 S.W.3d 574 (Tex.Crim.App. 2009)........................................... 60, 61

*Gamez v. State*,
737 S.W.2d 315 (Tex. Crim. App. 1987).................................................36

*Gardner v. State*,
730 S.W.2d 675 (Tex.Crim.App. 1987)..................................................60

*Goodwin v. State*,
307 S.W.2d 264 (1957) ...........................................................................35

*Gross v. State*,
380 S.W.3d 181 (Tex.Crim.App. 2012)........................................... 40, 41

*Guevara v. State*,
152 S.W.3d 45 (Tex.Crim.App. 2004)....................................................40

*Hernandez v. State*,
340 S.W.3d 55 (Tex.App.—Houston
[1st Dist.] 2011, no pet.)..........................................................................46

*Hernandez v. State*,
939 S.W.2d 173 (Tex.Crim.App. 1997)........................................ 24, 26, 31, 33

*Herron v. State*,
86 S.W.3d 621 (Tex.Crim.App. 2002)......................................................... 42, 43

*Jackson v. Virginia,*
443 U.S. 307 (1979) ...................................................................................23

*Johnson v. State*,
611 S.W.2d 649 (Tex.Crim.App. [Panel Op.] 1981) .........................................48

*Kemp v. State*,
846 S.W.2d 289 (Tex.Crim.App. 1992)..................................................... 60, 61

*Kincaid v. State*,
534 S.W.2d 340 (Tex.Crim.App. 1976).........................................................48

*King v. State,*
895 S.W.2d 701 (Tex.Crim.App. 1995).........................................................23

*Kunkle v. State*,
771 S.W.3d 435 (Tex. Crim. App. 1986)........................................................25

*Leday v. State*,
983 S.W.2d 713 (Tex.Crim.App. 1998).........................................................61

*Linton v. State*,
15 S.W.3d 615 (Tex.App.—Houston
[1st Dist.] 2000, pet. ref'd) .......................................................................68

*Mays v. State*,
726 S.W.2d 937 (Tex.Crim.App. 1986).........................................................27

*Mitchell v. State*,
No. 01-09-00865-CR, 2011 WL 1755424 (Tex.App.—Houston
[1st Dist.] 2011, pet. ref'd) (not designated for publication) .............................68

*Mosley v. State*,
983 S.W.2d 249 (Tex.Crim.App. 1998).........................................................57

*Neal v. State*,
108 S.W.3d 577 (Tex.App.—Amarillo 2003, no pet.).......................................66

*Oprean v. State*,
201 S.W.3d 724 (Tex.Crim.App. 2006)..................................................... 63, 64

*Paolilla v. State*,
342 S.W.3d 783 (Tex.App.—Houston
[14th Dist.] 2011, pet. ref'd) .....................................................................56

*Paredes v. State*,
129 S.W.3d 530 (Tex.Crim.App. 2004)...................................................... 35, 37

*Passmore v. State*,
617 S.W.2d 682 (Tex.Crim.App. 1981)...............................................................31

*Paulus v. State*,
633 S.W.2d 827 (Tex.Crim.App. 1981)...............................................................26

*Penagraph v. State*,
623 S.W.2d 341 (Tex.Crim.App. 1981)...............................................................23

*Reynolds v. State*,
489 S.W.2d 866 (Tex.Crim.App. 1972)...............................................................24

*Schultze v. State*,
177 S.W.3d 26 (Tex.App.—Houston
[1st Dist.] 2005, pet. ref'd).................................................................................57

*Sharp v. State,*
707 S.W.2d 611 (Tex.Crim.App. 1986)...............................................................24

*Smith v. State*,
332 S.W.3d 425 (Tex.Crim.App. 2011)...................................................... 30, 33

*Snowden v. State*,
353 S.W.3d 815 (Tex.Crim.App. 2011)...................................................... 58, 59

*Snyder v. State*,
68 S.W.3d 671 (Tex.App.—El Paso 2000, pet. ref'd) ................................. 25, 27

*Soto v. State*,
864 S.W.2d 687 (Tex.App.—Houston
[14th Dist.] 1993, pet. ref'd) .............................................................................48

*St. Julian v. State*,
132 S.W.3d 512 (Tex.App. – Houston [1st Dist.] 2004, pet. ref'd) ...................24

*State v. LaRue*,
152 S.W.3d 95 (Tex.Crim.App.  2004)...............................................................65

*Strickland v. Washington*,
466 U.S. 668 (1984) ...........................................................................................69

*Temple v. State*,
342 S.W.3d 572 (Tex.App.—Houston
[14th Dist.] 2010), *aff'd on other grounds* 390 S.W.3d 341 (Tex.Crim.App.
2013)............................................................................................................. 53, 54

*Thompson v. State*,
9 S.W.3d 808 (Tex. Crim. App. 1999)...................................................................69

*Vasquez v. State*,
67 S.W.3d 229 (Tex.Crim.App. 2002)...................................................................71

*Warner v. State*,
245 S.W.3d 458 (Tex.Crim.App. 2008)..................................................................34

*Zamora v. State*,
411 S.W.3d 504 (Tex.Crim.App. 2013)..................................... 35, 36, 37, 40, 41

*Zunker v. State*,
177 S.W.3d 72 (Tex.App.—Houston
[1st Dist.] 2005, pet. ref'd)................................................................................57

x

## STATUTES

TEX. CODE CRIM. P. ANN. art. 36.01(a)
(West 2006) ...................................................................................68

TEX. CODE CRIM. P. ANN. art. 36.28
(West 2006) ...................................................................................66

TEX. CODE CRIM. P. ANN. art. 38.14
(West 2005) ...................................................................................24

TEX. CODE CRIM. P. ANN. art. 38.14
(West 2006) ...................................................................................46

TEX. PENAL CODE ANN. §7.02
(West 2011) ...................................................................................36

TEX. PENAL CODE ANN. §7.02(a)
(West 2011) ........................................................................... 35, 39

TEX. PENAL CODE ANN. §7.02(a)(2)
(West 2006) ...................................................................................35

## RULES

TEX. R. APP. P. 38.2(a)(1)(A) ..................................................................... i

TEX. R. APP. P. 39.1 .................................................................................... i

TEX. R. APP. P. 44.2(b) ..................................................................... 57, 68

TEX. R. APP. P. 9.4(g) ................................................................................ i

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

The State charged appellant by indictment with the felony offense of murder.[1] Appellant pled not guilty, but a jury returned a guilty verdict on February 23, 2015.[2] The jury assessed sentence at 35 years confinement in the Texas Department of Criminal Justice, Institutional Division after finding both consecutive enhancement paragraphs "true."[3] Appellant filed timely written notice of appeal the same day.[4] He filed a motion for new trial, but he withdrew it before the trial court ruled.[5]

## STATEMENT OF FACTS

In September 2012, Michael Hourshad lived in Baytown, Texas, and supported himself by selling methamphetamine while his roommate sold heroin.[6]

---

[1] (CR-13);
The appellate record consists of the following:
   CR-Clerk's Record;
   RRI-RRX-Court Reporter's Record from February 10 through 24, 2015, prepared by Louise Steckler, however amended volume 3 (the voir dire portion), originally mistitled volume 2 of 7, was recorded by Julia Johnson. The State will refer to it as RRIII.
[2] (CR-170).
[3] (CR-173, 182).
[4] (CR-199).
[5] (CR-204-209, 211-212, 216).
[6] (RRIV-32, 33, 37).

Hourshad was friends with Tara Brown Cook, who went by Brown.[7] They were friends for about a year before September 2012, and Hourshad knew appellant as Brown's boyfriend.[8] He did not know Vernon Brooks, Joseph Kazee, or Rose Preece.[9]

On September 25, 2012, the complainant, Sergio Saldana came to Hourshad's house to pick up some heroin.[10] He arrived around 5:00 pm appearing antsy and shaky.[11] Recognizing he had heroin withdrawal, Hourshad permitted him to stay and shoot up.[12] Saldana went into the bedroom, and returned calmer.[13]

Hourshad smoked methamphetamine with Saldana.[14] Around that time, Brown and appellant stopped by.[15] Before Saldana arrived, Hourshad called Brown because he heard rumors that Saldana might rob him.[16] He asked Brown if he needed a gun, she thought not, and offered to check on him with appellant.[17]

---

[7] (RRIV-34, 47, 101).
[8] (RRIV-34, 35, 36).
[9] (RRIV-36-37). Rose Henderson was known at trial as Rose Preece. Because Stella Preece and Rose Preece share a last name, the State uses first names to avoid confusion.
[10] (RRIV-37-38).
[11] (RRIV-38).
[12] (RRIV-38-39).
[13] (RRIV-39).
[14] (RRIV-39).
[15] (RRIV-39-40, 49).
[16] (RRIV-47).
[17] (RRIV-47).

When Saldana was on his way over Hourshad told Brown.[18]  After Saldana arrived, Hourshad no longer felt fearful, and when Brown texted to ask if Saldana knew they were coming, Hourshad replied that Saldana did not seem to know Brown.[19]  Brown texted to ask if Saldana was a "real big guy," he answered, "Kinda but thing[s] [are] ok they seem[.]"[20]  Hourshad responded "yes" when asked if they were alone.[21]

Appellant and Brown arrived, came inside, and shook hands with Saldana.[22] The four spoke briefly, Saldana mentioned that he needed a ride home, and they offered him one.[23]  Brown and appellant left briefly, and a few minutes later Brown texted, "Don't worry we will be right back what are y'all doing leave the door unlocked[.]"[24]

Brown texted, "Did he take the hit yet."[25]  Hourshad replied, "Not yet.  Um I will unlock."[26]  Two minutes later, Brown texted, "Thank you just don't stan[d] by the door okay is he still on the couch[.]" and he texted "yes."[27]

---

[18] (RRIV-48).
[19] (RRIV-48, 66; State's Exhibit No. 2).
[20] (RRIV-66; State's Exhibit No. 2).
[21] (RRIV-66-67; State's Exhibit No. 2).
[22] (RRIV-49-50).
[23] (RRIV-50).
[24] (RRIV-51, 52, 67; State's Exhibit No. 2)
[25] (RRIV-67; State's Exhibit No. 2).
[26] (RRIV-67-68; State's Exhibit No. 2).
[27] (RRIV-68; State's Exhibit No. 2)

3

Saldana felt fearful after they left.[28] Saldana knew appellant was an Aryan Brotherhood of Texas (ABT) member, ABT wanted to hurt Saldana, and he wondered if he should leave.[29] Hourshad reassured.[30] Hourshad offered him a drink and they planned to play PlayStation in the bedroom.[31] Hourshad got drinks and went to the bedroom, but he turned to go back to the kitchen.[32]

As Hourshad turned around, someone burst through the front door screaming, "Get down motherfucker."[33] He recognized appellant's face among the men coming in.[34] He saw three guns and appellant held one.[35] He saw two faces, but he could not see the person standing behind appellant.[36] Hourshad denied that he received Brown's text 20 minutes after she told him to be away from the door that said, "there are about to be three people coming in don't be by the door or by him don't worry."[37]

Hourshad followed the instruction to "get down" and he covered his head as he saw Saldana sitting by the PlayStation.[38] He did not see Saldana make any

---

[28] (RRIV-52).
[29] (RRVI-231-232).
[30] (RRVI-232, 233-234).
[31] (RRIV-40, 52-53; State's Exhibit No. 73).
[32] (RRIV-52-53).
[33] (RRIV-54).
[34] (RRIV-54).
[35] (RRIV-54).
[36] (RRIV-77; RRVI-224-225).
[37] (RRIV-69-70; State's Exhibit No. 2).
[38] (RRIV-55).

4

aggressive moves towards the men.[39] Saldana laughed when the men came into the house.[40] Someone yelled, "Did you think you could get away?" and he heard someone punch Saldana.[41] The intruders focused on Saldana.[42] Hourshad heard three to four gunshots.[43]

After a minute, Hourshad peaked through his fingers and he saw the shortest man with a gun approach and demand "Did you see our face, motherfucker[?]"[44] The man repeated the question several times, but appellant waived him off.[45] The men left after telling him "don't do anything.…don't call the police."[46] Five minutes after the text about the three men, Hourshad received a text from Brown to "Erase my messages."[47]

Hourshad waited a few minutes, listened to ensure they left, and called 911.[48] Emergency personnel arrived and police questioned him.[49] He went to the Baytown Police Department to give a statement that evening, but he lied in it.[50] He feared the gunmen would hurt him or police would accuse him, so he concealed

[39] (RRIV-55).
[40] (RRVI-230).
[41] (RRIV-58).
[42] (RRIV-59).
[43] (RRIV-59).
[44] (RRIV-60).
[45] (RRIV-60).
[46] (RRIV-60).
[47] (RRIV-70; State's Exhibit No. 2).
[48] (RRIV-60-61).
[49] (RRIV-62-63).
[50] (RRIV-62).

Brown's texts and visit.[51] Hourshad's phone ran out of battery before he could delete the texts so he threw it in the police station trash.[52] Police reviewed Hourshad's text messages.[53] His call log showed a call from appellant at 6:33 and one from Brown which occurred at the same time Hourshad called 911.[54]

Police charged Hourshad with aggravated assault and possession of controlled substances found when they searched his house.[55] The State dismissed the assault charge and Hourshad pled guilty to a six-year deferred on the possession charge in January 2014.[56]

Brown testified that she had an intermittent relationship with appellant.[57] Hourshad called her on September 25, 2012, and they exchanged texts.[58] She and appellant went to Hourshad's and saw Saldana with him.[59] She knew Saldana.[60] She arrived while he heated heroin in the bedroom.[61] Hourshad appeared nervous,

---

[51] (RRIV-63, 64).
[52] (RRIV-70, 79-80, 95-96; RRVI-136).
[53] (RRIV-90, 91-92, 93; State's Exhibit No. 18)
[54] (RRIV-51, 65; State's Exhibit No. 114).
[55] (RRIV-71-72).
[56] (RRIV-72).
[57] (RRIV-101, 102).
[58] (RRIV-105).
[59] (RRIV-107)
[60] (RRIV-107).
[61] (RRIV-108).

but Saldana did not act aggressive.[62] Saldana sat and talked with them, but they left 15 minutes later.[63]

During the brief conversation, appellant went outside with his phone.[64] Appellant came back and said they had to go.[65] Appellant drove her to meet Vernon "Dinky" Brooks, Joseph "Worm" Kazee, and Stella Preece after Brooks' truck run out of gas.[66] They picked up Brooks, and appellant drove him to a gas station.[67] The jury saw surveillance photographs of appellant entering the gas station alone on September 25, 2012 at 5:55 p.m.[68]

Ten minutes later appellant drove them to Brooks' truck.[69] Appellant spoke to Brooks privately before he instructed Brown to text Hourshad.[70] The text messages occurred primarily between 17:10 and 17:29 when the couple first arrived at Hourshad's.[71] They exchanged more texts after the couple left while Brooks got gas at 17:56 about Hourshad leaving the door unlocked.[72]

---

[62] (RRIV-109).
[63] (RRIV-110).
[64] (RRIV-111).
[65] (RRIV-114).
[66] (RRIV-115, 116, 139).
[67] (RRIV-117).
[68] (RRIV-118-119; State's Exhibit No. 19-24).
[69] (RRIV-119, 120, 121).
[70] (RRIV-121, 129, 133).
[71] (RRIV-126; State's Exhibit No. 2).
[72] (RRIV-126; State's Exhibit No. 2).

7

After getting the gas, appellant drove them to Hourshad's while Brooks followed.[73]  Brown texted more questions appellant asked her to send from 17:56 through 18:00.[74]  Brown did not know what would happen.[75]  She knew Brooks had a past altercation with Saldana.[76]  Appellant instructed Brown at 18:24 to text Hourshad there would be three people coming in and he should avoid the door and Saldana.[77]  At 18:29, Brown texted that he should erase her messages.[78]

While they drove to Hourshad's, Brown recalled appellant talking or texting on his own phone.[79]  When they arrived the second time, appellant took off his top two shirts, and left the car in a tank top.[80]  Appellant carried his Springfield nine-millimeter semiautomatic handgun.[81]  Appellant placed the gun in his pants.[82]  Brooks and Kazee went into the house after appellant.[83]  Stella never went in.[84]

Brown heard two gunshots one right after the other.[85]  Appellant, Brooks, and Kazee came out with appellant in the lead.[86]  Brown drove because appellant

---

[73] (RRIV-127).
[74] (RRIV-129, 130).
[75] (RRIV-131, 132, 133).
[76] (RRIV-131).
[77] (RRIV-133).
[78] (RRIV-133, 134; State's Exhibit No. 2).
[79] (RRIV-135).
[80] (RRIV-136, 137).
[81] (RRIV-137, 167).
[82] (RRIV-138).
[83] (RRIV-141-142).
[84] (RRIV-168).
[85] (RRIV-143).

8

told her to move before he went inside.[87]  Appellant got into the passenger seat, and told her that Brooks shot at Saldana but he thought the bullet missed him.[88]  Brown called Hourshad fearful for his safety, but he did not answer.[89]  When he finally answered a later call, he had already called 911 and still sounded hysterical.[90]

Brown drove appellant to his mother's, and then they returned to Brown's trailer.[91]  They knew police would seek them and they run for two weeks, but Brown turned herself in on October 1, 2015.[92]  She tried to clear appellant's name by relaying the things he told her, but she lied at appellant's request about his going into the house.[93]  Police knew about the text messages, they arrested her for murder, and she spent a year in custody before the State dismissed the charge in exchange for her truthful testimony.[94]

Kazee knew appellant as "JoJo" and his girlfriend Brown.[95]  He knew Brooks, Stella as Brooks' girlfriend, and Rose as Stella's sister.[96]  On September

---

[86] (RRIV-143).
[87] (RRIV-144).
[88] (RRIV-144-145).
[89] (RRIV-145, 169-170).
[90] (RRIV-169-170).
[91] (RRIV-145, 146).
[92] (RRIV-147, 148).
[93] (RRIV-148-150).
[94] (RRIV-151-153, 154).
[95] (RRIV-176, 177-178).
[96] *Id*.

25, Kazee came into contact with Brooks, Stella, and Rose in the afternoon.[97]

Brooks picked Kazee up to give him a ride.[98]

Kazee was an ABT member for ten years, and he knew Brooks was a captain in ABT.[99] Kazee lacked rank and acted as a soldier requiring him to obey Brooks' commands or risk death.[100] Kazee knew appellant as an ABT enforcer.[101]

Earlier in September, Brooks had an altercation with Saldana, and he informed ABT members "to take violent action against" Saldana.[102] The 25th Kazee heard Brooks get a call from appellant.[103] Kazee recognized appellant's voice.[104] Appellant told Brooks he knew where to find Saldana, Brooks' demeanor changed, and he started to drive to Baytown.[105] Stella and Rose were also in the car.[106]

Stella, the older sister, insisted that Rose get out of the car, and she convinced Brooks to drop her at a gas station.[107] As they drove to Baytown,

---

[97] (RRIV-178-179).
[98] (RRIV-179).
[99] (RRIV-187, 188).
[100] (RRIV-188, 195).
[101] (RRIV-188-189).
[102] (RRIV-189-190).
[103] (RRIV-191).
[104] (RRIV-191).
[105] (RRIV-192).
[106] (RRIV-192).
[107] (RRIV-192).

10

Brooks' truck ran out of gas.[108]  Appellant met them and got them gas.[109]  Kazee thought Brooks stayed with the truck while appellant went for gas.[110]

Appellant put gas in Brooks' truck, and they drove to Baytown.[111]  Appellant showed Brooks the way to Saldana's location.[112]  Kazee understood they went to find Saldana and, "that he was only going to be beat up[.]"[113]  Kazee was under Brooks' order to be violent towards Saldana, but neither Stella nor Kazee were privy to appellant and Brooks' plan.[114]

At the house, Kazee saw Brooks take a .38 caliber revolver from his toolbox in the back of his truck, and he saw that appellant held a large-caliber semiautomatic.[115]  Kazee did not carry a gun.[116]  He heard appellant say, "Let's do this."[117]  Someone said Saldana's name, and Kazee saw Saldana in the bedroom.[118]

Appellant went up to Saldana, hollered at him, and pulled his gun.[119]  Brooks struck Saldana in the head with the gun.[120]  Saldana fell to the floor and Brooks

---

[108] (RRIV-192).
[109] (RRIV-193-194).
[110] (RRIV-194).
[111] (RRIV-194).
[112] (RRIV-194-196).
[113] (RRIV-194).
[114] (RRIV-195,211-213).
[115] (RRIV-196, 197, 208).
[116] (RRIV-197).
[117] (RRIV-197).
[118] (RRIV-198).
[119] (RRIV-198-199).
[120] (RRIV-199).

kicked him.[121] Saldana crawled away, and Kazee heard gunshots from where appellant stood.[122] He heard two shots and saw Brooks fire the second.[123] Kazee thought the first bullet struck Saldana because he had a chest wound.[124]

The men turned to go, but someone opened the bathroom curtains.[125] Brooks went to him and put his gun in the man's face.[126] Brooks and appellant turned to leave.[127] Appellant left first, then Kazee and Brooks.[128] Appellant left in his truck, and Stella drove Kazee and Brooks to a gas station.[129]

After the gas station, Brooks drove them to the river bottom in Channelview, and he went off into the salt grass where Kazee could not see him.[130] When Brooks returned to the truck, he did not have the gun.[131] Brooks had them wash off the gunshot residue.[132] He ordered Kazee to stay with them for a few hours before Kazee returned to his aunt's.[133]

---

[121] (RRIV-199).
[122] (RRIV-200).
[123] (RRIV-200).
[124] (RRIV-200).
[125] (RRIV-201-202).
[126] (RRIV-202).
[127] (RRIV-202).
[128] (RRIV-202).
[129] (RRIV-203).
[130] (RRIV-204).
[131] (RRIV-204).
[132] (RRIV-204).
[133] (RRIV-204-205).

Police interviewed Kazee two weeks later, but he lied.[134] Police did not charge Kazee with a crime.[135] When he testified, he was no longer an active ABT member.[136]

Stella was in a relationship with Brooks.[137] She knew appellant through Brooks and through Rose.[138] While she, Brooks, Rose and Kazee played video poker, Brooks received a call from appellant, but she did not hear the contents of the call.[139] They left the gas station and Brooks told her they left to meet appellant and Brown.[140]

The group got into Brooks' truck.[141] Rose, Stella, and Kazee went as passengers.[142] During the trip, Brooks answered another call from appellant, and Stella became upset because she did not want Brooks to see Saldana, and she did not want to leave the game room.[143] Stella insisted that Rose not accompany them because did not want Rose to be a part of any trouble.[144] She did not know what

---

[134] (RRIV-205).
[135] (RRIV-206).
[136] (RRIV-207).
[137] (RRIV-223).
[138] (RRIV-224-225).
[139] (RRIV-226).
[140] (RRIV-227).
[141] (RRIV-227).
[142] (RRIV-227).
[143] (RRIV-228-229).
[144] (RRIV-229).

13

would happen, but Rose should not be there.[145]  She convinced Brooks to drop Rose at the river bottom.[146]

Brooks acted aggressive and he would not listen when Stella dissuaded him.[147]  She begged him not to go, and Kazee also dissuaded Brooks, but Brooks just became irritated.[148]  They ran out of gas, appellant took Brooks to get gas, and he put gas in Brooks' truck.[149]  Brooks followed appellant to Saldana's location.[150]

When they arrived, appellant got out of his truck, but Stella did not see Brown get out.[151]  She did not see if appellant carried anything because she was arguing with Brooks until Brooks and Kazee got out of the truck.[152]  She saw nothing in Brooks and Kazee's hands, and she did not know that Brooks had a gun with him.[153]  Brooks owned guns, but he did not usually carry one.[154]

Stella saw appellant enter the house first, then Kazee, and last Brooks.[155] The men were not in the house long, and Stella sat in the car with the radio turned

---

[145] (RRIV-230).
[146] (RRIV-229).
[147] (RRIV-230).
[148] (RRIV-231).
[149] (RRIV-231).
[150] (RRIV-232-233).
[151] (RRIV-234).
[152] (RRIV-234).
[153] (RRIV-234-235).
[154] (RRIV-235).
[155] (RRIV-235).

14

up.[156]  She did not hear any noises before she saw the men come out.[157]  They walked quickly to the trucks and appeared "[s]hook up, nervous."[158]

Stella drove to the river bottoms at Brooks' instruction, where Brooks got out for a few minutes, then returned, and they left.[159]  The three stayed together for a few hours, but her relationship with Brooks soon ended.[160]

Stella learned from a newspaper article the following day about Saldana's murder.[161]  On cross-examination she agreed that she "could have been charged in connection with this" and that police "considered it[.]"[162]  Stella knew of no plan to harm Saldana at the time, she believed they would just "talk some shit" to him.[163]

Rose had previously had an intimate relationship with appellant.[164]  On September 25, she was with Kazee, Preece, and Brooks.[165]  Brooks got a call from appellant that he answered on speaker, and Rose recognized appellant's voice.[166]  Appellant said, "I've got it.  Hey, I got that—I got him."[167]  Brooks said he had people in the car, but appellant told him, "You asked for anybody to get—to stop

---

[156] (RRIV-236).
[157] (RRIV-236).
[158] (RRIV-236).
[159] (RRIV-237, 238).
[160] (RRIV-238-239).
[161] (RRIV-241).
[162] (RRIV-244).
[163] (RRIV-246).
[164] (RRIV-273, 275).
[165] (RRIV-277).
[166] (RRIV-277-278).
[167] (RRIV-278).

and get this guy."[168]  In the background she and Stella heard Brown, Stella shouted at Brooks and he ended the call.[169]  She thought appellant called back and Brooks appeared "tensed up," drove faster, and got red.[170]

Rose thought appellant "pull[ed] [Brooks'] card" meaning Brooks would lose status if he did not follow through on past statements.[171]  Brooks immediately began driving to Baytown, but Stella did not want him to go and she wanted Rose out of the car.[172]  Stella tried to talk Brooks out of "going and beating this dude's ass."[173]  Kazee also asked to be let out of the truck.[174]

Rose heard appellant say that "Tara can talk to Sergio", and he thought Tara could convince him to go someplace else.[175]  Brooks stopped, Rose got out, and she tried to convince Stella to stay with her.[176]  Rose did not see any weapons in the truck, and Brooks did not talk about shooting or killing Saldana.[177]  Brooks

---

[168] (RRIV-279).
[169] (RRIV-279).
[170] (RRIV-280).
[171] (RRIV-284-285).
[172] (RRIV-280).
[173] (RRIV-280).
[174] (RRIV-281).
[175] (RRIV-281, 282).
[176] (RRIV-283).
[177] (RRIV-294).

16

drove off, and she did not see Stella again until days later.[178] Rose later confronted appellant about involving Stella, and appellant apologized.[179]

A gang expert with Baytown Police Department assisted because police knew only nicknames from Hourshad's texts.[180] He identified "JoJo" as appellant.[181] Appellant is documented statewide as an ABT member.[182] Appellant has tattoos common among ABT members.[183] Joseph Kazee also has a consistent ABT tattoo.[184] Kazee and Brooks are documented ABT members.[185] The three women are known ABT associates.[186]

ABT members must sign a "Blind Faith Commitment" and follow the gang's constitution.[187] Even when a member disagrees with an order, he cannot disobey it, but he may complain later in a grievance procedure.[188] Disobedient members face discipline from beatings to murder, but obedient members may increase in rank.[189] The gang's code forbids members from cooperating with law

---

[178] (RRIV-286-287).
[179] (RRIV-289).
[180] (RRIV-253,254,256).
[181] (RRIV-258, 259).
[182] (RRIV-259-260).
[183] (RRIV-262).
[184] (RRIV-263).
[185] (RRIV-265-266).
[186] (RRIV-269-270).
[187] (RRIV-304,305).
[188] (RRIV-305-306).
[189] (RRIV-306, 307).

enforcement, and cooperation could result in the person's death.[190] Vernon Brooks was a permanent captain for ABT.[191]

In the room where police found the body, a crime scene investigator found a copper-jacketed projectile in the mattress.[192] The projectile entered the box springs at a 40 to 50 degree angle.[193] He recovered a projectile from the floor beneath Saldana's body.[194] He found a shell casing on the bed likely ejected from a semiautomatic weapon.[195]

The casing belonged to a nine millimeter Luger PPU type cartridge.[196] The projectile from the bed was consistent with firing from a nine-millimeter semiautomatic weapon.[197] But the characteristics from the floor projectile were consistent with a revolver.[198] At least two firearms were fired in the room.[199] A DNA analysis of the projectile recovered from beneath Saldana showed it contained biological material consistent with his profile.[200]

---

[190] (RRIV-308-309).
[191] (RRIV-310).
[192] (RRVI-37, 45).
[193] (RRVI-57).
[194] (RRIV-45).
[195] (RRVI-54).
[196] (RRVI-85).
[197] (RRIV-91).
[198] (RRVI-95, 104).
[199] (RRVI-97).
[200] (RRVI-212).

Saldana died from a single gunshot wound that entered on the left side of his body and exited through his right upper back near his shoulder.[201] As it passed through his body it caused extensive blood loss.[202]

The lead investigator interviewed Hourshad and learned ABT might be involved.[203] She tracked down information on Brown from her phone number, but she could not find appellant or Brown when she searched for them.[204] She charged Brown with murder and a prosecutor took aggravated assault on Hourshad.[205] She sought charges on Brooks and appellant, but the prosecutor declined because she lacked independent corroboration.[206] Finally, because of additional investigation and recovery of the firearms evidence, the prosecutor accepted a charge on appellant in December 2013.[207]

The investigator determined that Hourshad, Brown, Kazee, Brooks, and appellant were involved in the murder.[208] She did not consider Stella a participant because she never went into the house, she had no part in setting it up, and nothing indicated that she encourage the crime.[209]

---

[201] (RRVI-15,17-18,21,29).
[202] (RRVI-19-20).
[203] (RRVI-125,126,139).
[204] (RRVI-141, 142)
[205] (RRVI-149-152).
[206] (RRVI-151,153,157-158).
[207] (RRVI-163,166,168-169).
[208] (RRVI-178).
[209] (RRVI-178).

Appellant called two ABT members who claimed that appellant was not ABT.[210] Both claimed they met with Brooks a different times and he disclosed that someone was taking a murder case for him.[211] Patrick Miller claimed Brooks confessed to shooting Saldana with a revolver.[212] Miller maligned the three women and claimed they were "sack chasers" meaning they chased dope and would be with anyone that could supply their habit.[213]

Roy Ates referred to Stella as "Bro Ho" and a "sack chaser."[214] He claimed she would be with the person with the largest sack of dope.[215] He lacked familiarity with Brown, and knew Rose only as Stella's sister.[216] He claimed anyone could get whatever he wanted from Stella, Rose, and Kazee in exchange for dope.[217]

The prosecutor impeached both men with their extensive criminal histories, and Miller with a statement he gave in another murder case.[218] Jurors saw a photograph of Miller with other ABT members.[219] The State asked Ates about his initial statement which implicated two other women, but Ates denied changing his

---

[210] (RRVI-235, 236, 266).
[211] (RRVI-238-239,268,270,271-272).
[212] (RRVI-241).
[213] (RRVI-243-243).
[214] (RRVI-275, 276).
[215] (RRVI-276).
[216] (RRVI-276).
[217] (RRVI-276).
[218] (RRVI-249-250,252).
[219] (RRVI-255-256).

story.[220] During his testimony, Ates volunteered without objection that one could only be an ABT member if he had been to prison.[221] The jury found appellant guilty as charged.[222]

## SUMMARY OF THE ARGUMENT

More than sufficient evidence outside of the accomplice witnesses tended to connect appellant to the murder. Rose's testimony, Stella's testimony, the physical evidence, and the text messages connected appellant to the crime.

The trial judge properly found from the evidence that Stella was not an accomplice. Yet, even had she been, the error did not cause egregious harm when Rose's testimony, the firearm's evidence, and the text messages sufficiently connected appellant.

The comments the prosecutor made during guilt phase closing argument amounted to proper summation, reasonable deductions, and invited argument. The trial court did not err by overruling appellant's objections, but had she the comments did not cause substantial and injurious harm. The prosecutor did not make a specific comment on appellant's failure to testify, but had she, no harm resulted.

---

[220] (RRVI-280, 281).
[221] (RRVI-286).
[222] (RRVIII-5).

21

Brown's statement that appellant was "in and out of prison," was cured by the trial court's instruction to disregard and the same evidence came in without objection waiving error.

The prosecutor did not deliberately conceal Brown's recorded statement, and the trial court broke to give defense counsel an opportunity to hear the recording during trial. No prejudice resulted from the delayed disclosure and nothing demonstrated it contained *Brady* material.

The trial judge did not abuse her discretion by allowing the read back testimony the jury requested. She read the questions and answers relevant to the jury's inquiry and the necessary context information to make it make sense.

Any error in a failure to arraign appellant on his felony enhancement paragraphs did not harm him.

Trial counsel did not perform deficiently by failing to object to the lack of an accomplice witness instruction for Stella because she did not act as an accomplice. The order of the parties law and the accomplice instructions was not erroneous so any objection meritless. Trial counsel repeatedly objected to admissibility of the ABT evidence, the trial court considered it, and overruled the objections because the gang evidence was relevant and admissible to show motive.

Appellant did not preserve error to his claim that the State improperly impeached Miller and Brooks.

22

## **REPLY TO APPELLANT'S FIRST POINT OF ERROR**

Appellant first contends that the evidence was insufficient to corroborate the accomplices.  Appellant premises his sufficiency argument on Stella being an accomplice, and claims Rose's testimony alone is not enough to connect him.  Appellant ignores not only Stella's testimony, but also the physical evidence which included firearms evidence, text messages, the ABT connection, and the gas station photographs.  Considering the evidence as a whole, it tended to connect appellant to the murder.

## *I.  The standard of review and applicable law on sufficiency and corroboration of accomplice testimony*

In reviewing the legal sufficiency of the evidence, the appellate court determines whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[223]  This standard of review applies to both direct and circumstantial evidence.[224]

The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight given to the witnesses' testimony.[225]  The jury may reasonably infer

---

[223] *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).
[224] *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim.App. 1995).
[225] *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App. 1981).

facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered.[226]

The Texas legislature stated in article 38.14 of the Texas Code of Criminal Procedure that, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."[227] The reviewing court assesses the sufficiency of corroborating evidence by eliminating from consideration the testimony of the accomplice and examining the other evidence to ascertain if it tends to connect the accused with the commission of the offense.[228]

"The non-accomplice evidence need not be sufficient in itself to establish the accused's guilt beyond a reasonable doubt…Nor is it necessary for the non-accomplice evidence to directly link the accused to the commission of the offense."[229] The prosecution satisfies the accomplice witness rule, "if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment."[230]

---

[226] *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986).
[227] TEX. CODE CRIM. P. ANN. art. 38.14 (West 2005).
[228] *St. Julian v. State*, 132 S.W.3d 512, 516 (Tex.App. – Houston [1st Dist.] 2004, pet. ref'd)(*citing Hernandez v. State*, 939 S.W.2d 173, 176 (Tex.Crim.App. 1997)).
[229] *Hernandez*, 939 S.W.2d at 176.
[230] *Id.* (emphasis original).

The Texas legislature statutorily imposed a sufficiency review under the accomplice-witness rule.[231] It is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.[232] The burden upon the prosecution requires only that it provide some other evidence tending to connect the defendant to the offense.[233] The Court considers a witness an accomplice if the person participated with the accused before, during or after the commission of the crime.[234] A witness is an accomplice as a matter of law when charged with the same offense or a lesser included of the offense for which the defendant is tried.[235]

## II. *The jury heard more than sufficient evidence to establish appellant's guilt apart from accomplice testimony*

Ample evidence corroborated the accomplice evidence in this case and connected appellant to the crime. The proper focus is not whether the other evidence standing alone sufficiently establishes guilt, but whether after eliminating from consideration the accomplice testimony, the other evidence is inculpatory and tends to link appellant to the crime.[236] While individually a circumstance might not be sufficient to corroborate the accomplice testimony, taken together, if

---

[231] *Cathey v. State*, 992 S.W.2d 460, 462-463 (Tex.Crim.App. 1999).
[232] *Id.*
[233] *Id.* at 463.
[234] *Kunkle v. State*, 771 S.W.3d 435, 439 (Tex.Crim.App. 1986)(citations omitted).
[235] *Druery v. State*, 225 S.W.3d 491, 498 (Tex.Crim.App. 2007).
[236] *Snyder v. State*, 68 S.W.3d 671, 677 (Tex.App.—El Paso 2000, pet. ref'd).

rational jurors could conclude that the evidence sufficiently tended to connect appellant to the offense the evidences suffices.[237]

### a. The text messages connected appellant to the crime

Tara Brown's texts to Hourshad repeatedly referred to "we" when she asked if he knew "we are coming", "we are on our way", and "we will be right back".[238] She texted, "[t]here are about to be three people coming in don't be by the door or by him don't worry."[239] Rose heard appellant and Brown together over Brooks' call while Brown texted "we."[240] Rose heard appellant tell Brooks, "I got him" shortly before he mentioned "Sergio."[241] Rose's testimony with the texts identified appellant.

### b. Rose Preece's testimony connected appellant to the crime

Rose heard Brown's and appellant's voice on the call.[242] And Brooks identified them.[243] The call established that Brown and appellant were together,

---

[237] *Hernandez*, 939 S.W.2d at 178-79 (holding suspicious circumstances filled sufficiency gap left by evidence of appellant's mere presence at the scene of the offense); *Paulus v. State*, 633 S.W.2d 827, 846 (Tex.Crim.App. 1981) (evidence showing motive or opportunity can be considered in connection with other evidence tending to connect the accused to the crime)).

[238] (State's Exhibit No. 2).

[239] *Id.*

[240] (RRIV-276,277,278,279,280,281).

[241] (RRIV-278, 282).

[242] (RRIV-279).

[243] (RRIV-281).

and that they found the person Brooks wanted.[244] Appellant referred to Brown and Saldana during the call, "Tara can talk to him, this guy, Sergio, that Tara can talk to him and get him to go somewhere."[245]

Rose understood that Brooks and appellant "were just going to be beating this guy's ass[.]"[246] The call caused such a disturbance in Brooks' truck that Stella insisted Brooks stop to let Rose out of the car, but she saw Kazee, Stella, and Brooks leave together.[247] Rose said appellant "pull[ed] [his] card" because the meant Brooks had to participate or lose status.[248]

After the murder, Rose confronted appellant about involving Stella and getting her in trouble.[249] Rather than deny involvement or claim no knowledge or intent, appellant responded "I'm sorry."[250] A defendant's confession to committing the crime may be sufficient to corroborate an accomplice's testimony "so long as proof of the confession does not depend upon the testimony of the accomplice."[251] Rose testimony alone connected appellant to the crime based on

---

[244] (RRIV-278-281).
[245] (RRIV-282).
[246] (RRIV-282).
[247] (RRIV-281, 282-283, 285).
[248] (RRIV-284-285).
[249] (RRIV-288, 289).
[250] (RRIV-289).
[251] *Snyder*, 68 S.W.3d at 677 n. 5; *Mays v. State*, 726 S.W.2d 937, 942 (Tex.Crim.App. 1986)).

27

his comments about using Brown to get Brooks close to "Sergio" on the same day three men murdered Sergio Saldana.

### c. Stella Preece connected appellant directly to the murder

The trial court decided the evidence did not raise a fact issue about whether Stella was an accomplice.[252] It did not include her on the list of people that could have been charged with the murder or a lesser-included of it.[253] As addressed in the State's response to the next point of error, an instruction on Stella was not required, and this Court should consider Stella's testimony in its sufficiency analysis.

Stella was with Rose and Brooks when Brooks received the call from appellant.[254] They left the game room to meet appellant and Brown.[255] During the ride, Brooks received another call from appellant, and the call upset Stella because she did not want to go with Brooks to meet with appellant and Brown, and she did not want Rose to go.[256] She knew from the call there would be "trouble" and she did not want to go.[257] She and Kazee tried to talk Brooks out of going.[258]

---

[252] *See* (CR-160-162).
[253] *Id.*
[254] (RRIV-226, 227).
[255] (RRIV-227).
[256] (RRIV-228-229).
[257] (RRIV-229).
[258] (RRIV-230).

They ran out of gas, Brooks called appellant, and appellant took Brooks to get more.[259] Stella understood they were going to see "Sergio."[260] Sergio was the man Brooks had a previous altercation with.[261] Appellant told Brooks where to find Sergio, and they were headed to him.[262] Brooks followed appellant's truck there.[263] They could not have gone without appellant showing them the way.[264]

At the house, appellant got out with Brooks and Kazee.[265] They went into the house as appellant led the charge.[266] They came out a few minutes later, walked fast, and appeared shaken up.[267]

Stella later talked to appellant and learned something happened when they went inside.[268] The day after, she learned that Sergio Saldana had been murdered.[269] Stella's testimony more than sufficed to connect appellant to Saldana's murder.

---

[259] (RRIV-228).
[260] (RRIV-231).
[261] (RRIV-231-232).
[262] (RRIV-232).
[263] (RRIV-232).
[264] (RRIV-233-234).
[265] (RRIV-234).
[266] (RRIV-235).
[267] (RRIV-236).
[268] (RRIV-241).
[269] (RRIV-241).

### d. The gas station surveillance photographs corroborated the accomplice witness testimony and tended to connect appellant to the crime

Circumstantial evidence may corroborate accomplice testimony and connect a defendant.[270] To corroborate Stella's testimony and link appellant to the crime, the State presented photographs from the gas station where appellant took Brooks.[271] The date and time corroborated Brown, Kazee, and Stella's testimony about Brooks running out of gas and appellant getting more to get them to Saldana.

### e. The firearms evidence tended to connect appellant to the crime

The firearms evidence further connected appellant to the murder. Brown testified that appellant left the truck to go into Hourshad's house carrying a nine-millimeter semiautomatic handgun.[272] She knew him to carry a nine-millimeter in the truck.[273] Kazee saw Brooks holding a revolver and appellant with a black semiautomatic handgun.[274]

Police recovered two projectiles and one casing from the bedroom.[275] One of the projectiles was consistent with being fired from a revolver, and the casing

---

[270] *Smith v. State*, 332 S.W.3d 425, 442 (Tex.Crim.App. 2011) (citations omitted).
[271] (RRIV-117; State's Exhibit No. 19-24); *compare* (State's Exhibit No. 23) (surveillance photograph) *with* (State's Exhibit No. 25) (identification photograph of appellant).
[272] (RRIV-137, 138).
[273] (RRIV-138).
[274] (RRIV-196, 197).
[275] (RRVI-45,54,55,57,61,73-75).

and other projectile from a nine-millimeter semiautomatic.[276]  At least two different firearms produced the evidence.[277]  The types of firearms used during the murder provided additional circumstantial evidence which tended to connect appellant to the murder.  The Court of Criminal Appeals in *Hernandez v. State* held that "Proof that connects appellant to a weapon similar to that used in the offense is another circumstance to be considered when determining the sufficiency of evidence to corroborate the accomplice."[278]

### f.  Appellant fled after the murder and hid from police

The investigator searched for appellant and Brown after the murder, but could not locate them.[279]  Appellant changed his cell phone so when police tried to "ping" it to locate him, the number was no longer active.[280]  Appellant's deliberate flight after the murder and attempt to hide from police connected him to the crime.[281]  The Court of Criminal Appeals held that flight and guilty demeanor

---

[276] (RRVI-85,90-91,94,95,97,98,104).

[277] (RRVI-97).

[278] *Hernandez*, 939 S.W.2d at 178 ("[E]ven evidence that a defendant had a gun which was merely similar to the murder weapon may corroborate accomplice testimony.").

[279] (RRVI-138-139,140,142,154).

[280] (RRVI-154).

[281] *See Hernandez*, 939 S.W.2d at 178 ("Evidence of flight and guilty demeanor, coupled with other corroborating circumstances, may tend to connect a defendant with the crime."); *Passmore v. State*, 617 S.W.2d 682, 685 (Tex.Crim.App. 1981) (evidence presented at trial showing flight corroborates accomplice testimony).

31

coupled with other corroborating circumstances may serve to corroborate accomplice testimony.[282]

###### g. Appellant's motive to participate in the murder connected him

The evidence of appellant's connection with and enforcer status in ABT tended to connect him to the murder. Appellant was a member of ABT.[283] He bore tattoos consistent with status as ABT.[284] Rose knew appellant as an ABT member and an enforcer for it.[285] Brooks' had a prior altercation with Saldana, appellant pulled Brooks' card to make him live up to his threats.[286] Appellant began the call by telling Brooks had asked "for anybody to…stop and get this guy."[287]

ABT members must sign a Blind Faith Commitment and follow orders without question or face discipline.[288] As a captain, Brooks could give orders to lower ranking Kazee and appellant.[289] The gang evidence showed appellant's motive to participate in the crime and assist Brooks in retaliating against Saldana.

---

[282] *Id.*
[283] (RRIV-254, 258, 259, 261).
[284] (RRIV-261,262,264-265,268,312-313).
[285] (RRIV-295, 296, 297).
[286] (RRIV-232, 284-285).
[287] (RRIV-279).
[288] (RRIV-304, 306, 307).
[289] (RRIV-304, 306, 310).

### h. Considered as a whole, evidence outside of accomplice testimony tended to connect appellant to the murder

The Court of Criminal Appeals explained, "[t]he sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case."[290] When the record presents conflicting views of the evidence with one tending to connect the defendant and the other not, a reviewing court must defer to the factfinder's resolution.[291] The jury was properly charged on accomplice evidence, they knew it needed corroboration, and they found from the non-accomplice evidence that it tended to connect appellant to this murder.[292]

Viewed in its totality, the physical evidence, surveillance photographs, text messages, and the Preece sisters' testimony more than sufficed connect appellant to Saldana's murder.[293] This Court must overrule appellant's first point of error.

## REPLY TO APPELLANT'S SECOND POINT OF ERROR

The trial court concluded that Stella Preece was not an accomplice in Saldana's murder. The jury charge was not erroneous. Yet, even had the trial court erred by failing to include an accomplice as a matter of fact instruction on

---

[290] *Smith*, 332 S.W.3d at 442.

[291] *Id*.

[292] (CR-160-162, 170; RRVII-17,18,20-22,24-25,38-39,44,47-48,51-52,59,64).

[293] *Smith*, 332 S.W.3d at 442; *Hernandez*, 939 S.W.2d at 176-179 (evidence the defendant was with the complainant two hours before the killing, two people killed the victim, the defendant fled after the murder, the defendant in the past possessed one of the types of weapons, and the defendant drank the type of beer found at the scene sufficient to corroborate accomplice evidence).

33

Stella, egregious harm did not result because other non-accomplice evidence tended to connect appellant to the murder.

## I. The standard of review and applicable law regarding charge error and accomplice witness instructions

Reviewing courts consider jury charge error in a two-step process: (1) determining whether error occurred, and if so, (2) whether the error caused sufficient harm to warrant reversal.[294] The amount of harm necessary for reversal depends upon whether trial counsel preserved the complaint.[295]

Absent objection a reviewing court should not reverse unless the error caused egregious harm denying appellant a fair trial.[296] The Court examines "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole" when considering egregious harm.[297] Appellant must suffer some actual, not theoretical, harm.[298]

A witness is an accomplice when she participates with the defendant before, during, or after the commission of the crime charged, and she acts with the

---

[294] *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984); *Abdnor v. State*, 871 S.W.2d 726, 731-32 (Tex.Crim.App. 1994).

[295] *Id.*

[296] *Almanza*, 686 S.W.2d at 171; *see also Warner v. State*, 245 S.W.3d 458, 461 (Tex.Crim.App. 2008).

[297] *Id.*

[298] *Warner*, 245 S.W.3d at 461.

required mental state.[299] Accomplice status may exist under Texas Penal Code Section 7.02(a) or 7.02(b) because the witness could be charged with the same or a lesser included of the charged offense.[300]

To be an accomplice, the person must act "'with the requisite culpable mental state,' and perform[ ] an 'affirmative act that promotes the commission of the offense with which the defendant is charged.'"[301] One is not an accomplice if merely present during the offense, or even if the person knew about the crime, failed to disclose it, or concealed it.[302] When the evidence does not demonstrate an ongoing conspiracy to attempt or carry out a felony made by the alleged accomplices, or affirmative acts to assist in the murder, no instruction is required.[303]

The testimony of a witness without complicity in the charged offense is not accomplice-witness testimony, regardless of the person's complicity with the accused in other offenses unless the person was involved in a conspiracy to commit one felony, the murder was committed in furtherance of that conspiracy, and that the witness should have anticipated that a murder could result from the

---

[299] *Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim.App. 2004) (citing TEX. PENAL CODE ANN. §7.02(a)(2) (West 2006)) (emphasis added).

[300] *Zamora v. State*, 411 S.W.3d 504, 510-11 (Tex.Crim.App. 2013).

[301] *Id.* at 510 (quoting *Cocke v. State*, 201 S.W.3d 744, 747 (Tex.Crim.App. 2006)).

[302] *Blake v. State*, 971 S.W.2d 451, 454 (Tex.Crim.App. 1998).

[303] *Paredes*, 129 S.W.3d at 539.

conspiracy.[304]   When the evidence is conflicting and the status is not clear on the

witness's accomplice-status, the trial court should leave the question to the jury

after defining the term.[305]

## II. *Stella was not an accomplice*

The evidence did not support the conclusion that Stella Preece acted as a

party under a Texas Penal Code section 7.02(a), and the evidence did not raise the

theory that Stella was a party pursuant to section 7.02(b) as a coconspirator.[306]

---

[304] *See Gamez v. State*, 737 S.W.2d 315, 322 (Tex.Crim.App. 1987); *see also Zamora*, 411 S.W.3d at 510-11 (citing TEX. PENAL CODE ANN. §7.02(b) (West 2006), but explaining the evidence raised the theory when the jury was charged on coconspirator liability in the party's instruction on the charged offense); TEX. PENAL CODE ANN. §7.02(b) (West 2011) (defining party liability under a coconspirator theory).

[305] *Paredes*, 129 S.W.3d at 536.

[306] *See* (CR-157-158, 160) (defining party status to including only the section 7.02(a) definition); (RRIV-47-52, 59; State's Exhibit No. 2) (Hourshad communicated only with Brown and appellant, and he saw three men in the room); (RRIV-105-111,113-145-145;State's Exhibit No. 2) (Brown did not implicate Stella in acts leading up to or following the murder, and indicated she was merely present in Brooks' truck at the time); (RRIV-192-205) (Kazee explained there was no discussion about what would happen or what anyone should do, and he confined Stella's actions to driving them to a gas station afterwards); (RRIV-226-241) (Stella said there was no discussion of what would happen, of where they would go, she begged Brooks not to go, she confined her actions to driving away, but stating she saw no guns, did not hear gunshots, and learned of the death the following day); (RRIV-278-285) (Rose stated Stella left as a passenger in the car, Stella tried to convince Brooks not to go, they did not discuss what would happen, she did not see any weapons in the car, and no one talked of shooting or killing); *see also* TEX. PENAL CODE ANN. §7.02 (West 2011) (defining under (a) that a person is criminally responsible when she "act[s] with the intent to promote or assist in the commission of the offense" and she "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense" and defining under (b) "in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense

36

a. Stella was not an accomplice under Texas Penal Code Section 7.02(b)

It is important to note that the trial court did not instruct the jury on a 7.02(b) theory of liability for appellant's guilt or in the accomplice instructions.[307] In *Zamora v. State*, the jury instructions included the 7.02(b) coconspirator language for the parties instruction, but not for the accomplice witness instructions.[308] The Court referenced *Parades v. State* to find error because the trial court in *Parades* had instructed on the conspiracy aspect of parties law, and the defendant argued accomplice-witness status under that theory.[309]

Appellant's argument that Stella was a coconspirator as an accomplice under 7.02(b), was not the basis upon which the jury determined appellant's guilt as a party or the status of the accomplice witnesses.[310] Only a theory of direct action as the principal perpetrator and his soliciting, encouraging, directing, aiding or attempting to aid while he had the requisite intent to promote or assist in the

---

was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy.").

[307] (CR-157-158,160).

[308] *Zamora*, 411 S.W.3d at 508.

[309] *Id*. (quoting *Parades*, 129 S.W.3d at 538-39).

[310] *Compare* (CR-157-158,160) *with Zamora*, 411 S.W.3d at 508-511 (addressing need for a *sua sponte* instruction on accomplice witness as a matter of fact based on a section 7.02(b) theory of the witness being a party); *Parades*, 129 S.W.3d at 539 (addressing applicability of section 7.02(b) to determining party status but finding there was no evidence the witnesses were conspirators in carrying out a felony when the murders were committed).

37

commission of the murder were proffered as the theory of appellant's party liability.[311]

However, were this Court to consider section 7.02(b) to determine Stella's status, no evidence presented during trial indicated that she conspired to commit a felony. All the evidence indicated that no discussion occurred in Brooks' truck about what would happen when they reached the house.[312] No weapons were visible in his truck.[313] There was no talk of killing Saldana, and although Kazee, Rose, and Stella thought that Saldana might be assaulted, the only discussion in the car was about Brooks and appellant getting Saldana somewhere.[314]

Rose testified that she found out "after the fact" that they intended to beat someone up.[315] She assumed they meant to "kick [Saldana's] ass[,]" but all she heard in the car was "that they were going to get him somewhere."[316]

Stella understood even less because Brooks did not mention his intent to harm Saldana to her, and she thought he intended to "talk some shit maybe."[317]

---

[311] (CR-157-158, 160).
[312] (RRIV-157-158,191,194,203,211-213,230,231, 234-235,245,246-247,279-283,293-294).
[313] (RRIV-196, 235, 247, 294).
[314] (RRIV-194, 211-213, 247, 280, 282-283, 294).
[315] (RRIV-280).
[316] (RRIV-293-294).
[317] (RRIV-245, 246

She had seen Brooks "talk a lot of shit." But there was no plan to harm Saldana or discussion that they would "do this or that[.]"[318]

Even Kazee did not indicate there was any sort of a plan or discussion of what would follow. He understood they were going to beat Saldana up, but Brooks had previously made known to all members of ABT that they should "take violent action against" Saldana.[319] Kazee did not hear any specific plans on what would occur, and likely formed his understanding of Brooks' intention to assault Saldana on the past order.

Nothing in the record supports the conclusion that Stella was part of a conspiracy to commit a felony, that the murder occurred in furtherance of that felony, or that she should have anticipated that it would result from the conspired felony.[320]

b.  Stella was not an accomplice under Texas Penal Code Section 7.02(a)(2)

The record does not support the conclusion that Stella had the requisite intent to promote or assist Brooks or appellant to commit the murder, or that she solicited, encouraged, directed, aided, or attempted to aid Brooks or appellant to commit the murder.[321]  On the contrary, she begged Brooks not to go meet with

---

[318] (RRIV-245-247).
[319] (RRIV-183-184, 185-186, 190, 191, 211-213).
[320] See TEX. PENAL CODE ANN. §7.02(b) (West 2011).
[321] See TEX. PENAL CODE ANN. §7.02(a) (West 2011).

Saldana.[322]  She clearly had no intention to promote or assist appellant or Brooks in commit the murder.

The evidence does not indicate that Stella knew about the murder or had any reason to believe that driving Brooks from the scene would assist Brooks and appellant to commit the crime.  Because the accomplice-witness statute does not define the term accomplice, the Court of Criminal Appeals defined it "as someone who, under the evidence, could have been charged with the same or a lesser-included offense as that with which the defendant was charged."[323]  Stella could not have been found guilty under section 7.02(a)(2), and was not an accomplice.[324]

In *Gross v. State*, the Court of Criminal Appeals considered evidence of post-offense behavior of someone alleged to have been a party, and found the evidence insufficient.[325] It held that post-offense conduct standing alone is not sufficient to prove one's guilt as a party.[326]  Instead, to prove guilt, "[t]here must also be sufficient evidence of an understanding or common scheme to commit a crime."[327]  The evidence in *Gross* was insufficient because the defendant could not

---

[322] (RRIV-230, 245, 280).
[323] *Zamora*, 411 S.W.3d at 510 (citing *Medina v. State*, 7 S.W.3d 633, 641 (Tex.Crim.App. 1999)).
[324] *See id*.; *see also Gross v. State*, 380 S.W.3d 181, 186-88 (Tex.Crim.App. 2012) (holding post-offense conduct standing alone is not enough to establish party status under section 7.02).
[325] *Gross*, 380 S.W.3d at
[326] *Id*. at 188.
[327] *Id*. (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004)).

have anticipated that his passenger would shoot, he did not encouraged him to shoot, and no evidence showed a "contemporaneous plan to shoot the victim[.]"[328] Although the defendant drove the shooter away from the scene after he heard the gunshot, the Court held that the evidence was insufficient to prove guilt as a party to the murder.[329]

The evidence from all the witnesses established that Stella was not a part of a plan to kill Saldana.[330] Any plan existed solely between appellant and Brooks. She could not have anticipated that the men would use guns, she did not seem them take guns, and she did not hear a gunshot before she drove away.[331] She did not encourage Brooks to engage in the violent conduct and actively discouraged it.[332] She was no guiltier as a party than Gross, and therefore was not an accomplice under section 7.02(a)(2). The trial court did not err by failing to include Stella in the accomplice-witness instructions.[333]

---

[328] *Id*. at 187-88.
[329] *Id*. at 183-184, 187-89.
[330] (RRIV-157,158,191,194,203,211-213,230,231,234,235,245,246-247,279-283,293-294).
[331] (RRIV-196, 235, 236, 247, 294).
[332] (RRIV-230, 245, 280).
[333] *See Gross*, 380 S.W.3d at 187-189; *see also Zamora*, 411 S.W.3d at 510 (addressing the definition of an accomplice-witness to include section 7.02(a)(2) parties).

### III. Egregious harm did not result

Yet, even were this Court to consider the second prong of *Almanza*, it considers whether egregious harm resulted because appellant did not object.[334] The Court of Criminal Appeals applies the egregious harm standard to unpreserved claims of accomplice-witness instructions.[335] Even had the trial court erred by failing to include an accomplice as a matter of fact instruction on Stella as "law applicable to the case," the error did not result in egregious harm.[336]

To determine whether the failure to instruct on the accomplice witness would have caused jurors to find "the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive," the reviewing court considers the record as a whole to determine egregious harm, considering the strength of the corroborating evidence which is a function of its: (1) reliability or believability; and, (2) how compellingly it tends to connect the accused to the charged offense.[337]

In this case, there was a considerable amount of corroborating evidence tending to connect appellant beyond Stella's testimony. The physical evidence corroborated the accomplices. Police recovered a bullet consistent with a nine-

---

[334] *See Herron v. State*, 86 S.W.3d 621, 632 (Tex.Crim.App. 2002);(RRVII-4).

[335] *Saunders v. State*, 817 S.W.2d 688, 692 (Tex.Crim.App. 1991); *Casanova v. State*, 383 S.W.3d 530, 533 (Tex.Crim.App. 2012).

[336] *See id. et al*.

[337] *Casanova*, 383 S.W.3d at 534, 359.

millimeter and one consistent with a revolver, there were two shots fired by two guns, and the angle at which the bullet entered the mattress was consistent with Hourshad's recollections of the events after the shooting.[338]

The text messages corroborated by Rose's testimony connected appellant, as well as Rose's overhearing of the telephone call.[339] Finally the ABT connection, the gas station photographs, his flight from police, and the circumstantial evidence connected appellant.[340] The reliability of the independent corroborating evidence in the form of photographs, physical evidence, and Rose's testimony compellingly connected appellant to the murder.

The Court of Criminal Appeals explained a missing accomplice-witness instruction reviewed for egregious harm is generally harmless "unless the corroborating (non-accomplice) evidence [was] 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'"[341] Only in a case where the evidence had a weak tendency to connect the defendant to the crime and was contradicted by other evidence, did the error

---

[338] *Compare* (State's Exhibit No. 82-87, 118; RRIV-45, 56, 57; RRVI-85, 86, 91, 94, 95, 97, 98, 104, 168-172)(firearms evidence) *with* (RRIV-57-60)(Hourshad's recollections); (RRIV-137, 208)(descriptions of guns used).

[339] (State's Exhibit No. 2; RRIV-122-130, 278-282, 294).

[340] (RRIV-115-118, 187-190, 193-194; State's Exhibit No. 19-24).

[341] *Herron*, 86 S.W.3d at 632.

rise to a level requiring reversal.[342]  In this case, no evidence contradicted the physical evidence, surveillance photographs, or Rose's testimony.

All things being equal, even on a "some harm" analysis, the non-accomplice evidence would need to be stronger than in an egregious harm analysis.[343] Reviewing courts also consider the tenuousness of the evidence supporting accomplice-witness status along with the amount of non-accomplice evidence.[344] The reliability inquiry is satisfied when: "(1) there is non-accomplice evidence, and (2) there is no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense."[345]  The evidence that Stella acted as a willing participate in a pre-planned murder or aggravated assault was non-existent and the corroborating evidence strong.

In *Medina v. State*, the error was harmless under a "some harm" standard for potential accomplices as a matter of fact.[346]  The Court of Criminal Appeals in *Medina* found there was a substantial amount of non-accomplice evidence, and the evidence of the witness's accomplice status was tenuous "barely enough to support

---

[342] *Id.*
[343] *Herron*, 86 S.W.3d at 633.
[344] *Id.*
[345] *Id.*
[346] *Medina*, 7 S.W.3d at 642.

the submission as an accomplice as a matter of fact" instruction.[347] Reviewing this record as a whole, egregious harm did not result from the lack of an accomplice-witness instruction on Stella Preece.[348]

## IV. The jury charge correctly instructed on accomplice-witness law and applied the facts to the law

The trial court's charge included an application paragraph regarding the accomplices.[349] It instructed on accomplice-witness law generally, and then instructed that: "The witnesses, Tara Cook and Joseph Kazee and Michael Hourshad, are accomplices,…and you cannot convict the defendant upon their testimony unless you further believe that there is other evidence in the case outside of…[their] testimony…tending to connect the defendant with the offense committed."[350] Appellant's contention there is "no application paragraph in the court's accomplice charge" is inaccurate.[351]

No statutory or case law requires that the trial court include a separate credibility requirement with an accomplice-witness instruction. "As a general proposition, a jury charge that tracks the language of the relevant statute is

---

[347] *Herron*, 86 S.W.3d at 633.
[348] *See id.*
[349] (CR-160-161).
[350] (CR-160-161).
[351] *Compare* (Appellant's Brief-18) *with* (CR-160-161).

sufficient and therefore not erroneous."[352]  In this case, the trial court's accomplice witness instruction properly tracked the language of article 38.14.[353]  The additional instruction "unless the jury first believes that the accomplice evidence is true" does not appear in article 38.14, and appellant provides not authority that required its inclusion.[354]

The charge instructed on the burden of proof, that one accomplice could not provide corroboration for another, and that the jury was the sole judge of the credibility of the witnesses, but ordered that the trial court's instructions govern the jury.[355]  The instructions accurately relayed the law applicable to the case.

In reference to appellant's separate complaint that the accomplice-witness instructions were confusing and permitted the jury to convict appellant before assessing the accomplice-witness testimony, the jury charge is read as a whole.[356] The jury may consider the parts in the order it chooses, and the charge is not

---

[352] *Hernandez v. State*, 340 S.W.3d 55, 61 (Tex.App.—Houston [1st Dist.] 2011, no pet.) (citations omitted).

[353] *Compare* (CR-160-161) *with* TEX. CODE CRIM. P. ANN. art. 38.14 (West 2006)).

[354] *See* (Appellant's Brief-20-23) (citing McClungs for proposition that a separate credibility instruction was required); *but see* TEX. CRIM. P. CODE ANN. art. 38.14 (West 2006); (CR-161, 167).

[355] (CR-161, 166-167).

[356] *See Barrios v. State*, 283 S.W.3d 348, 352 (Tex.Crim.App. 2009) (holding the jury is left to consider the parts of the charge in the order they choose and that the charge must be considered as a whole).

erroneous merely because it might be better practice to order it differently.[357] Appellant provides no authority to indicate the trial court erroneously ordered the charge, or that the jury did not consider the charge as a whole before reaching its verdict.[358] Appellant has not established charge error, much less egregious harm. Appellant's second point of error must be overruled.

## REPLY TO APPELLANT'S THIRD AND SIXTH POINTS OF ERROR

Appellant's third and sixth points of error address comments the prosecutor made during closing statement, some in guilt and one in punishment.[359] He complains about various statements made during the guilty phase argument, and about a comment in punishment closing that he contends violated his right to remain silent. Appellant waived error or did not preserve it to most of his complaints. He cannot show error to the others, and even could he, no harm resulted.

---

[357] *See id.* (holding the practice of including "will acquit…and next consider" in the lesser-included offenses instructions was not erroneous when the charge was considered as a whole).

[358] *See id.* ("The trial judge reads the entire charge to the jury before it retires to deliberate; the jurors will thereby have heard the instruction on the benefit of the doubt before considering the issue of guilt on any of the offenses included in the charge.").

[359] The State joins its responses on the third and sixth points because they address closing argument.

## I. *The standard of review and applicable law*

The primary purpose of closing argument is to aid and assist jurors in properly analyzing the evidence to arrive at a just and reasonable conclusion.[360] Permissible jury argument falls within one of four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) response to argument by opposing counsel; and (4) pleas for law enforcement.[361]

The prosecutor may not inject any prejudicial or incriminating facts not in the record that would mandate a reversal.[362] But "[i]f defense counsel invites argument, then it is appropriate for the State to respond."[363] The State may not stray beyond the scope of the invitation.[364]

## II. *The closing arguments*

### a. Guilt Phase

Appellant invoked Saldana's family during closing argument saying they "deserved better….[b]etter police work, better presentation of this mishmash of evidence[.]"[365] He attacked Kazee, Brown, Hourshad, Stella and Rose.[366] He argued that the non-accomplice evidence failed to corroborate appellant's

---

[360] *Dickinson v. State*, 685 S.W.2d 320, 322 (Tex.Crim.App. 1984).

[361] *Bonier v. State*, 738 S.W.2d 726, 730 (Tex.App.—Houston [14th Dist.] 1989, no pet.).

[362] *Id.*

[363] *Soto v. State*, 864 S.W.2d 687, 693 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd).

[364] *Johnson v. State*, 611 S.W.2d 649, 650 (Tex.Crim.App. [Panel Op.] 1981).

[365] (RRVII-33).

[366] (RRVII-16-24,26).

participation.[367]  He claimed that he was not trying to be mean to the investigator during cross but had to show she did not know her case.[368]

The State responded with the non-accomplice evidence connecting appellant to the crime.[369]  On credibility, the prosecutor mentioned without objection that "when every single one of them walked in this court and took that witness stand, they put a target on their back….The Aryan Brotherhood of Texas doesn't send you flowers when you testify against them."[370]  Without objection the prosecutor stated that Kazee was "as good as dead."  From his demeanor they could see that "he [was] a marked man."  Roy Ates admitted that Kazee had been "X'd out" by ABT.[371]

On Miller's credibility the prosecutor noted, "…Miller was forced to admit that apparently, whenever anyone in the Aryan Brotherhood commits a murder— and he told you about Greg Gammon—he just happens to show up and says the person didn't intent to commit the crime."[372]  Defense counsel objected "outside the evidence[,]"the trial court overruled, and reminded the jury to recall the

---

[367] (RRVII-22-24).
[368] (RRVII-28).
[369] (RRVII-47-48).
[370] (RRVII-49).
[371] (RRVII-50).
[372] (RRVII-54).

49

evidence.[373]  The prosecutor then argued without objection that Miller admitted he was present for another ABT murder.[374]  "That's what they do.  They show up and they vouch for each other."[375]

Addressing Ates' credibility, the prosecutor argued that his first version blamed Christina and Nicole.[376]  Trial counsel objected that the comment was outside the evidence, the trial court overruled, and reminded the jury to recall the evidence.[377]  The prosecutor argued without objection that Ates' story changed, he needed a new story, and he offered the same story as Miller.[378]

The prosecutor discussed the Saldana family and the investigator's work on the case.[379]  She said, "unless you've gone into a living room and promised a family when their family member is dead that you will do everything[.]"[380] Defense counsel objected to outside the evidence, but the trial court overruled the objection.[381]  She continued without objection, "Until you have gone into a family's living room and until you have prayed with them for justice, you will never know what that promise is like and the cross that she has beared (sic)."

---

[373] (RRVII-54).
[374] (RRIV-54).
[375] (RRVII-54).
[376] (RRVII-55-56).
[377] (RRVII-56).
[378] (RRVII-56-57).
[379] (RRVII-60).
[380] (RRVII-60).
[381] (RRVII-60).

50

The prosecutor noted without objection that appellant's counsel mocked Stella and Rose.[382] The defense witnesses were also derogatory about the women.[383] The defense posed no objections to these arguments.[384] Regarding the investigator's cross she asked jurors to "think back, [she] took this witness stand and opposing counsel was extremely derogatory and rude and stood up here in the corner and tried to get in her face and bully her until the judge...."[385] Trial counsel objected that the State was "striking counsel over the shoulder of the defendant."[386] The trial judge overruled the objection, counsel objected to improper argument, and moved for a mistrial, but the trial court denied the requests.[387] The prosecutor continued without objection that he "[s]tood right there up in her face, didn't get her rattled. And she admitted to the mistakes that she made."[388]

After arguing regarding ABT was the motive she said:

> They've always known all of these people were in the Aryan Brotherhood of Texas. And let's talk about that, because you would have to be blind, deaf, and dumb not to notice all the people that have come in and out of this courtroom for the last week. If you don't thinking they

---

[382] (RRVII-57-58).
[383] (RRVII-58).
[384] (RRVII-57-58).
[385] (RRVII-62).
[386] (RRVII-62).
[387] (RRVII-63).
[388] (RRVII-63).

were watching the people that testified and making a note of where—[389]

The defense objected "outside the evidence," the judge overruled, and reminded the jury they would recall the evidence.[390] The prosecutor continued for another paragraph without objection about the witnesses fear stating she did not ask for home addresses because they were scared.[391]

### b. Punishment Phase

In the punishment phase argument, the State highlighted the jury's power to do justice for the Saldana family and hold appellant responsible.[392] None of the evidence should cause them to show appellant mercy, as his sister had wanted them to do.[393] Although his family's claimed he had a rough childhood, "We've all been dealt bad things. None of the rest of us committed murder. They asked for mercy because mercy is about me. He's never taken any responsibility. Never once has he come in here and said what his role is."[394] The defense objected to an improper comment on the Fifth Amendment.[395] The trial judge overruled the

---

[389] (RRVII-64-65).
[390] (RRVII-65).
[391] (RRVII-65).
[392] (RRIX-28).
[393] (RRIX-28-29).
[394] (RRIX-29).
[395] (RRIX-29).

objection.[396]  The prosecutor did not return to it, but followed with their verdict would hold appellant responsible.[397]

### *III. Appellant waived error to all of his guilt phase complaints*

A defendant must objection each time the improper jury argument is made or he waives his complaint regardless of how egregious the argument.[398]  In each of appellant's guilt phase complaints, he either failed to object or he failed to object each time the prosecutor made the argument.

When the prosecutor commented on Miller showing up in other cases to say the person lacked intent he objected, but the prosecutor continued the argument without further objection.[399]  He waived this error.[400]  On the Roy Ates argument about his changing his story, she again continued the argument without further objection.[401]  Appellant waived error.[402]

On the argument that the jury did not know what it was like to promise a family that you would do everything, after the objection the prosecutor continued the argument without another objection and commented about the investigator

---

[396] (RRIX-29).
[397] (RRIX-29).
[398] *Temple v. State*, 342 S.W.3d 572, 603 (Tex.App.—Houston [14th Dist.] 2010), *aff'd on other grounds* 390 S.W.3d 341 (Tex.Crim.App. 2013).
[399] (RRVI-54).
[400] *Temple*, 342 S.W.3d at 603.
[401] (RRVII-56-57).
[402] *Temple*, 342 S.W.3d at 603.

having "prayed with them for justice."[403]  Because appellant did not object, he waived error.[404]

Appellant's complaints about defense counsel acting derogatory and rude to the investigator went on without another objection that he "stood right there…in her face[.]"[405]  Appellant waived error.[406]

Appellant did not object to the comment about not asking for home addresses.[407]  He objected to an earlier comment about audience intimidation.[408] He did not renew the objection despite the lengthy argument continuing.[409]

Appellant waived error to all of his guilt phase closing complaints by failing to object or renewing his objections in the trial court, and this Court should not reach the merits of those claims.[410]

## IV. Most of the prosecutor's guilty phase arguments were within the scope of proper summation

Yet, had appellant preserved error, the comments were within the bounds of legitimate argument.  First, Miller testified that he knew Greg Gammon, that he did not know that Gammon was a documented ABT member, and that he gave a

---

[403] (RRVII-60).
[404] *Temple*, 342 S.W.3d at 603.
[405] (RRVII-62-63).
[406] *Temple*, 342 S.W.3d at 603.
[407] (RRVII-65).
[408] (RRVII-65).
[409] (RRVII-65-66).
[410] *Temple*, 342 S.W.3d at 603.

statement in the Gammon murder case even though he was "not there at the actual scene" or "around there" during it.[411] The prosecutor's use of hyperbole is not erroneous when it is a reasonable deduction from the evidence, and jurors are capable of understanding rhetorical hyperbole.[412] The prosecutor's argument that Miller shows up and "says the person didn't intend to commit the crime" when someone in ABT commits murder was hyperbole based on a reasonable deduction from the evidence.[413]

Second, the argument that the investigator never quit on the case because she promised the Saldana family justice was a reasonable inference from the testimony.[414] The jury learned that the investigator worked for more than a year to charge appellant and Brooks.[415] The comment formed a plea for law enforcement, a permissible area of jury argument. Appellant also invited it after his invocation of the Saldana family to claim they "deserved better" than the investigation the investigator conducted.[416]

---

[411] (RRVI-249-250, 252

[412] *Erlandson v. State*, 763 S.W.2d 845, 855 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd) ("Jurors are quite capable of sifting through such hyperbolic tactics.").

[413] *See id.*; *compare* (RRVI-249-252) *with* (RRVII-54).

[414] *Compare* (RRIV-147-168) *with* (RRVII-60).

[415] (RRVI-147-174).

[416] *Compare* (RRVII-33-34) *with* (RRVII-60-61).

Third, audience intimidation of witnesses was a reasonable inference from the evidence. Ates admitted that Kazee had been "X'd out."[417] The FBI Agent testified that any ABT member cooperating with law enforcement could be punished with murder.[418] The evidence supported the reasonable inference that testifying placed the State's witnesses in danger. The record showed the prosecutor had not asked any of the witnesses their addresses.[419] The argument was a reasonable deduction from the evidence.

Fourth, the prosecutor's comment about defense counsel bullying was invited by his claim that he did not intent to be mean to the investigator.[420]

## V. *No harm resulted closing argument*

### a. <u>Guilty Phase</u>

Yet, even had all of the comments been improper, they were harmless because they did not cause substantial and injurious harm. Even had the trial court erred by failing to sustain the objections, it does not require reversal.[421] The comments created no risk that the jury would convict on facts not in evidence.[422] They did not raise any constitutional implications, and are reviewed for harm under

---

[417] (RRVI-227).
[418] (RRIV-304-306, 308-309, 310, 311, 314).
[419] (RRIV-30, 101, 175-176, 223, 271).
[420] *See* (RRVII-28).
[421] *See Paolilla v. State*, 342 S.W.3d 783, 794-95 (Tex.App.—Houston [14th Dist.] 2011, pet. ref'd).
[422] *See id*. at 795.

appellate rule 44.2(b).[423]  This Court must balance the severity of the misconduct in terms of the prejudicial effect, any curative measures taken, and the certainty of conviction absent it.[424]

The comments were not severe.  They were unlikely to create a prejudicial effect that would have shifted the jury from a not guilty to a guilty verdict. Although the judge overruled the objections, she reminded the jury multiple times to "recall the evidence."[425] The arguments did not exaggerate or strengthen the non-accomplice evidence.  Rather, they questioned the credibility of the defense witnesses and pointed to the efforts made by the investigator.[426]  Nothing in any of the guilt phase arguments would have made the State's case significantly more persuasive.  Even if erroneous, they were harmless.

### b.  Punishment Phase

Lastly, the prosecutor's punishment phase closing argument would not have been taken as a direct comment on appellant's failure to testify, and it did not harm appellant.  To violate the right against self-incrimination, the offending language must be viewed from the jury's standpoint and the implication that the comment

---

[423] *Zunker v. State*, 177 S.W.3d 72, 84 (Tex.App.—Houston [1st Dist.] 2005, pet. ref'd); *see also* TEX. R. APP. P. 44.2(b).

[424] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998).

[425] (RRVII-54, 56, 65,

[426] *See Schultze v. State*, 177 S.W.3d 26, 45 (Tex.App.—Houston [1st Dist.] 2005, pet. ref'd) (holding comment regarding effect of crime on victim's parents was outside the record, but harmless because if did not convey specific facts).

referred to the defendant's failure to testify must be clear.[427] It is not sufficient that the language might be construed as an implied or indirect allusion.[428] The test is whether the language was manifestly intended or of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify.[429] In applying this standard, the context in which the comment was made must be analyzed to determine the character.[430]

The initial comment that appellant had "never taken any responsibility" did not directly implicate his failure to testify.[431] Although, she then eluded to "come in here," which could have been taken to refer to the courtroom, it would not necessarily and naturally have been taken by the jury as a comment on the defendant's failure to testify.[432] Yet, even had it, when reviewing the record as a whole, this Court has fair assurance that the error did not contribute to appellant's sentence.[433]

This Court considers under *Snowden v. State*: (1) the nature of the error, namely objectionable jury argument; (2) whether it was emphasized by the State;

---

[427] *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex.Crim.App. 2001).
[428] *Id.*
[429] *Id.*
[430] *Id.*
[431] (RRIX-29).
[432] *See Bustamante*, 48 S.W.3d at 764.
[433] *See Snowden v. State*, 353 S.W.3d 815, 821-22 (Tex.Crim.App. 2011) ("The harmless-error inquiry under Rule 44.2(a) should adhere strictly to the question of whether the error committed in a particular case contributed to the verdict obtained in that case.")

58

(3) the probable implications of the error; and (4) the weight jurors would have assigned to it during deliberations.[434] The prosecutor did not emphatically invite the jury to consider appellant's failure to testify.[435] After the one brief comment, she did not return to the topic other than to ask jurors to hold appellant responsible with their verdict.[436] She did not emphasize the comment, and it was not likely to have swayed the punishment verdict. When faced with a sentencing range of 25 years to life, the jury returned the low-end sentence of 35 years.[437] Reviewing the record as whole, this Court should find beyond a reasonable doubt that the prosecutor's comments did not contribute to the sentence.[438]

This Court should overrule appellant's third and sixth points of error.

## REPLY TO APPELLANT'S FOURTH POINT OF ERROR

Appellant next complains about Brown's testimony that appellant was "in an out of prison."[439] But the trial court cured the comment with an instruction to disregard, and the jury heard the same evidence later without objection.

---

[434] *Id*. at 822.
[435] *See* (RRIX-29-30).
[436] (RRIX-29-30).
[437] (CR-174, 182).
[438] *See id*.; *see also Snowden*, 353 S.W.3d at 822-826.
[439] (Appellant's Brief-27).

## I. *Testimony that appellant had been in prison*

During Brown's testimony, she explained that she and appellant "we would be together and he would get in trouble or going in and out of prison and he'd get out and get back together."[440]  Defense counsel objected, the trial court initially overruled the objection, but it nevertheless instructed "[j]ury will disregard the last statement."[441]  Ates later admitted members had to go to prison to be ABT.[442]

## II.  *The instruction and Ate's testimony cured the error*

A trial court's prompt instruction to disregard generally cures error to a witness's reference to the defendant's past conviction.[443]  An "uninvited and unembellished reference to appellant's prior incarceration—although inadmissible—was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard."[444]  Instructions to disregard generally cure improprieties that occur during trial because courts presume that the jury will follow them.[445]

---

[440] (RRIV-102).

[441] (RRIV-103).

[442] (RRVI-286).

[443] *See Kemp v. State*, 846 S.W.2d 289, 308 (Tex.Crim.App. 1992) ("It is well-settled that testimony referring to or implying extraneous offense can be rendered harmless by an instruction to disregard…unless it appears the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind.").

[444] *Id*.

[445] *See Gamboa v. State*, 296 S.W.3d 574, 581 (Tex.Crim.App. 2009)(holding instruction to disregard of extraneous offense cured error).

60

In this case, the prosecutor did not elicit the testimony, but asked only "was he someone that you would occasionally date?"[446] She did not request appellant's prison background, the witness volunteered it.[447] The trial judge promptly instructed the jury to disregard.[448] There is no reason to believe the jury did not follow the court's instruction.[449] The comment was not so inflammatory as to undermine efficacy of the trial court's instruction.

Likewise, the jury heard the same evidence without objection from Ates which cured the error.[450] Ates' testimony one had to go to prison to be ABT, along with evidence of appellant's documented-status as ABT established his prison record. The jury heard the same evidence curing error.[451] This Court should overrule appellant's fourth point of error.

## REPLY TO APPELLANT'S FIFTH POINT OF ERROR

Appellant's fifth point of error accused the State of a willful discovery violation and claimed the trial court refused counsel access to Brown's recorded

---

[446] (RRIV-102).
[447] *Id.*
[448] (RRIV-103).
[449] *See Gamboa*, 296 S.W.3d at 581.
[450] *See Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998).
[451] *See id.*; *see also Kemp*, 846 S.W.2d at 30.

statement.[452]   The record refutes appellant's claims and he has not established a *Brady* violation.

## I. The record does not support appellant's claims

At the end of Brown's testimony, she was released subject to recall by defense counsel.[453]   During the investigator's testimony, defense counsel asked about the three statement police took from Brown.[454]   The investigator testified she recorded the third interview with Brown.[455]   Defense counsel was told by "the previous prosecutor that this third recording did not exist," learning it did he wanted to hear it.[456]   The prosecutor did not know about the recording, and said she would have to get a copy.[457]   Because the State did not have it, the judge instructed counsel to continue his cross.[458]

At the conclusion of the investigator's testimony, trial counsel again requested the recording, but he agreed the witness could be excused and he would proceed with his case.[459]   At the conclusion of his evidence, counsel stated he needed to listen to the recording to decide whether to recall Brown or the

---

[452] (Appellant's Brief-30).
[453] (RRIV-174).
[454] (RRVI-190-191).
[455] (RRVI-191).
[456] (RRVI-191).
[457] (RRVI-191).
[458] (RRVI-192).
[459] (RRVI-220-221).

investigator.[460] The trial broke for the day, presumably for the State to obtain the recording and defense counsel to listen to it.[461] The following day, he rested without presenting any additional witnesses.[462] Trial counsel made no further mention of the recording, he did not object to a failure of the State to procure it, or to an inability for him to review it. Presumably, when he rested after the break he had listened to the tape and found nothing to pursue from it.[463] He did not raise the issue again before he rested.

Trial counsel made no *Brady* objection during the trial. He did not claim unfair surprise, and he did not pursue a defense from the recording. The record does not support appellant's claims regarding a "willful" discovery violation or a failure to permit inspection during trial.[464]

## II. Appellant's misplaces his reliance on *Oprean v. State*

Appellant relies exclusively on *Oprean v. State* for the proposition that the trial court erred.[465] First, appellant's claims inaccurately reflect that counsel never heard the recording during the break conducted for counsel to review it.[466]

---

[460] (RRVI-289-290).
[461] (RRVI-290).
[462] (RRVII-4).
[463] *See* (RRVI-289-290; RRIV-4).
[464] *Compare id. with* (Appellant's Brief-30-32) (claiming the trial court refused to release statement and that the State willfully hid the recording).
[465] (Appellant's Brief-31-33) (citing *Oprean v. State*, 201 S.W.3d 724 (Tex.Crim.App. 2006)).
[466] *Id.*

Second, trial counsel and the prosecutor's comments indicate she did not have a copy of the recording and did not know about it.[467] The investigator dealt with "several different DAs" while she worked on the case indicating she gave it to someone else.[468]

Appellant's reliance on *Oprean* is misplaced. In *Oprean*, the trial court admitted a recording over defense objection that had not been released during discovery.[469] The Court held that evidence "willfully withheld from disclosure under a discovery order should be excluded from evidence."[470] No evidence was introduced in this case counsel could have moved to suppress on this basis.

*Oprean* addressed a deliberate failure to comply and focused on the "willful choice" of a prosecutor. It held that the prosecutor's deliberate deception and decision not to disclose evidence she intended to present demonstrated willful conduct.[471] This record contains no similar evidence of deception or willful conduct. Rather, consistent with *State v. LaRue*, the prosecutor did not willfully

---

[467] (RRIV-191-192).
[468] (RRVI-192).
[469] *Oprean*, 201 S.W.3d at 725.
[470] *Id*.
[471] *Id*. at 727-28.

attempt to keep the recording from defense counsel, but was also unaware of it.[472]

This Court should overrule appellant's fifth point of error.

## REPLY TO APPELLANT'S SEVENTH POINT OF ERROR

Appellant complains in his seventh point about the "read back" testimony the trial court provided to the jury in answer to its question as overbroad. But the trial court included only testimony responsive to the question and necessary to put it in context.

### I. The jury's requests and the testimony read back

During deliberations, the jury noted on a preprinted form that it disagreed about the statements of Stella, certified its disagreement, stated the point of dispute, and requested in Stella testimony about how she identified appellant as Brooks' caller.[473] The trial court listed the portions it planned to read, but the defense objected to part of the read back referencing a second phone call, but the State argued it showed how Stella identified appellant initially.[474] The trial court read that portion, as well.[475]

---

[472] (RRVI-191-192); *Compare id. with State v. LaRue*, 152 S.W.3d 95 (Tex.Crim.App. 2004) (holding failure to produce DNA evidence was not "willful" and therefore not entitled to suppression).

[473] (CR-154, 155).

[474] (RRVII-68-69).

[475] (RRVII-70-71).

## II. *The read back testimony was responsive to the jury's question*

Texas Code of Criminal Procedure Article 36.28 permits the trial court to have read to the jury from the court reporter's notes the part of a witness's testimony addressing the dispute when the jurors disagree about the witness's statement.[476] When a dispute occurs, "the trial court must interpret the communication, decide what portion of the testimony best answers the question, and limit the testimony accordingly."[477] A reviewing court does not disturb the trial court's ruling absent an abuse of discretion.[478]

In *Brown v. State*, the Court of Criminal Appeals considered a claim that the trial court exceeded the topic of the jury's dispute in its read back.[479] The Court looked to the scope of the juror's question and determined it was broad enough to encompass the testimony.[480] Based on the question, the trial court correctly placed the answer in context with several passages regarding who was in the area because "the trial court correctly reasoned that the entire testimony between that first question and the last response was necessary…in response to their question[.]"[481]

---

[476] TEX. CODE CRIM. P. ANN. art. 36.28 (West 2006).
[477] *Neal v. State*, 108 S.W.3d 577, 579 (Tex.App.—Amarillo 2003, no pet.) (citing *Brown v. State*, 870 S.W.2d 53, 55 (Tex.Crim.App. 1994)).
[478] *Brown*, 870 S.W.2d at 55.
[479] *Brown*, 870 S.W.2d at 55-56.
[480] *Id*. at 55-56.
[481] *Id*. at 56.

To excise the intermediate portions "would have added more confusion rather than resolved the jury's question."[482]

Similarly, the question was how Stella identified appellant on the call.[483] The entire portion of the testimony read back addressed the answer to that question.[484] Part of how Stella identified appellant as the caller was through the subsequent calls.[485] The trial judge did not abuse her discretion by reading back all the relevant testimony.[486] And the court would not have erred even had the testimony only been necessary context to the answer.[487] This Court should overrule appellant's seventh point of error.

## REPLY TO APPELLANT'S EIGHTH POINT OF ERROR

Appellant's eighth point of error complains that the trial court improperly allowed the jury to consider the enhancement paragraphs when the State had not arraigned him on them. The record is silent as to the trial court arraigning appellant on the enhancement paragraphs and obtaining his plea. The reading of the enhancement paragraphs at the punishment phase of trial and obtaining of his

---

[482] *Id.*
[483] (CR-154).
[484] (RRVII-70-71).
[485] *See* (RRVII-70-71).
[486] *See Brown*, 870 S.W.2d at 55-56.
[487] *See id.* at 56.

plea is mandatory.[488]  Appellant objected before punishment closing argument, and the trial court overruled the objection but entered "not true" pleas on his behalf.[489] The jury instructions allowed for the jury to consider both enhancement paragraphs and it found them true.[490]

Because a violation of article 36.01 is not structural in nature, it is subject to harmless error analysis for non-constitutional harm.[491]  As this Court concluded in *Linton v. State*, appellant did not suffer a substantial or injurious effect from the failure to arraign him when he did not incriminate himself, he did not take the stand, and the evidence of his prior convictions was unchallenged.[492]  Nothing in the record would indicate that appellant was "misled into believing the State abandoned the enhancement allegations" or cause him to incriminate himself.[493] The failure to formally arraign appellant did not cause a substantial or injurious effect on the punishment verdict.[494]

---

[488] TEX. CODE CRIM. P. ANN. art. 36.01(a) (West 2006).

[489] (RRIX-4).

[490] (CR-182).

[491] *Linton v. State*, 15 S.W.3d 615, 620-21 (Tex.App.—Houston [1st Dist.] 2000, pet. ref'd) (citing Tex. R. App. P. 44.2(b); *Aguirre-Mata v. State*, 992 S.W.2d 495, 498 (Tex.Crim.App. 1999)).

[492] *Compare Linton*, 15 S.W.3d at 621 (no harm from failure to arraign on enhancement paragraphs) *with* (RRVIII-7-18, 33-58) (evidence of priors and defense evidence did not incriminate appellant).

[493] *See id.*

[494] *See id.*; *see also Mitchell v. State*, No. 01-09-00865-CR, 2011 WL 1755424, at *5 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd)(not designated for publication) (not harmed by failure to arraign on enhancements).

**REPLY TO APPELLANT'S NINTH POINT OF ERROR**

In his ninth point of error, appellant includes three claims of ineffective assistance of counsel. Neither the law nor the facts support them.

*I. The standard of review and applicable law*

Appellant has the burden of proving his trial counsel ineffective.[495] The two prong test requires proof that: (1) that counsel's performance was so deficient that he was not functioning as acceptable counsel under the Sixth Amendment; and (2) that there is a reasonable probability but for counsel's error, the result of the proceedings would have been different.[496]

*II. Trial Counsel did not perform deficiently and his actions did not result in prejudice which undermined confidence in the outcome*

a. The jury charge was not erroneous

As demonstrated in the State's response to appellant's second point of error, the jury charge properly relayed the law of the case. The State relies on its previous arguments to show that trial counsel was not deficient for failing to request an accomplice-witness instruction on Stella because no view of the record showed her as a party to murder. Likewise, no law required the trial court to order the charge as appellant now requests. Read as a whole the trial court would have

---

[495] *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999).
[496] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

properly overruled trial counsel's request to reorder it. Appellant has not carried the heavy burden of proving deficient conduct for either claim.

### b. Trial counsel repeatedly objected to the gang evidence

On appellant's final claim, trial counsel repeatedly objected to the gang evidence. Before trial he objected to the State identifying the parties based on ABT titles.[497] During Brown's testimony, trial counsel objected to testimony about gang connection.[498] Before eliciting ABT evidence, the State received permission from the court because the evidence was relevant and showed motive in the face of counsel's extraneous offense objection.[499] During Kazee's testimony the trial court conducted a hearing to address admissibility of the gang evidence, defense counsel objected to relevance, but the trial court overruled it.[500] He reurged the objection during testimony.[501]

Trial counsel is not deficient for failing to lodge an objection unless the trial court would have erred by overruling it.[502] Gang evidence when used to establish motive is relevant and admissible over a rule 404(b) objection, and not unduly prejudicial because the "potential character conformity inference does not

---

[497] (RRIV-9-10).
[498] (RRIV-52).
[499] (RRIV-112-113).
[500] (RRIV-186-187).
[501] (RRIV-190, 256-260).
[502] *Ex parte White*, 160 S.W.3d 46, 53 (Tex.Crim.App. 2004).

substantially outweigh the relevant purpose of showing motive for the…murder."[503] Even had trial counsel objected under rule 403 and continued to object to every reference to ABT under rule 404, the trial court would not have abused its discretion in overruling the objections because membership in ABT established appellant's motive.[504] This Court must overrule appellant's ninth point of error.

## REPLY TO APPELLANT'S TENTH POINT OF ERROR

In his final point of error, appellant claims the trial court erred by admitting an extraneous offense accusation against Miller and Brooks. Appellant waived error to Miller's cross and did not object to the question about Brooks committing other murders. That testimony benefited his defense strategy.

### I. Failure to request instruction to disregard waived error to Miller complaint

The State asked Miller about Greg Gammon.[505] The prosecutor mentioned the 2012 murder, and trial counsel objected that the evidence was irrelevant, and "also impeachment with some kind of extraneous offense."[506] At the end of the

[503] *Vasquez v. State*, 67 S.W.3d 229, 239-40 (Tex.Crim.App. 2002) (trial court did not err to admit gang evidence when motive for robbery and murder despite claims it violated rules 401, 402, 403, and 404); *see also Medina*, 7 S.W.3d at 643 (evidence of gang membership and rivalries relevant despite rule 401, 403, and 404 complaints when established motive).

[504] *See id*.; *Medina*, 7 S.W.3d at 643.

[505] (RRVI-249).

[506] (RRVI-250).

bench conference, the trial judge sustained the objection "with regard to going any further into the facts of that case or his testimony in that case."[507]

The State asked if he had been a witness in the Gammon murder case, but Miller denied being aware anyone was murdered and denied being present for it.[508] Trial counsel renewed his relevancy objection, the trial court sustained it, and the prosecutor moved on to the witness's testimony about appellant.[509] The trial court sustained appellant's objections, and he sought no further relief.

To preserve error to a sustained objection, appellant must then move to instruct the jury to disregard or for a mistrial, but when the trial court gets the relief requested, and the testimony could have been cured with an instruction to disregard, appellant waives error by not seeking the instruction.[510] The evidence did not implicate the witness in the murder, but instead explained he was a witness. Even had the testimony been improper an instruction to disregard would have cured it.[511]

---

[507] (RRVI-252).
[508] (RRVI-252).
[509] (RRVI-252-253).
[510] *See Cureton v. State*, 800 S.W.2d 259, 261 (Tex.App.—Houston [14th Dist.] 1990, no pet.); *see also Doherty v. State*, 892 S.W.2d 13, 19 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd) (appellant must timely object, request an instruction to disregard and request a mistrial to preserve error when an instruction would have been sufficient to cure error).
[511] *See id*.; *see also Doherty*, 892 S.W.2d at 19.

## II. The Vernon Brooks complaint was unpreserved

Appellant last complains that the trial court permitted the State to ask Miller if he would be surprised to learn Brooks was under investigation for multiple murders.[512] Appellant did not object to the testimony because his defense was to blame Saldana's murder on Brooks.[513] Failure to object waives error.[514]

This Court must overrule appellant's tenth point of error because he did not preserve it.

---

[512] (RRVII-259; Appellant's Brief-45-46).
[513] (RRVII-259); *see also* (RRVII-15-16, 20, 23-24, 27-30, 32-33).
[514] Tex. R. App. P. 33.1(a); *see also Arana v. State*, 1 S.W.3d 824, 829 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd) (party opposing evidence has burden to object to impeachment evidence or he waives error).

## PRAYER

The State respectfully requests that this Court affirm the trial court's judgment.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ *Jessica Caird*

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5826
State Bar Number: 24000608
caird_jessica@dao.hctx.net

## CERTIFICATE OF SERVICE

I certify that I have requested that efile.txcourts.gov electronically serve a copy of the foregoing instrument to appellant's attorney at the following email address on November 11, 2015:

Lana Gordon
Attorney at Law
3730 Kirby, Suite 1120
Houston, Texas  77098
lanagordonlaw@aol.com

/s/ *Jessica Caird*

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5826
State Bar Number: 24000608
caird_jessica@dao.hctx.net

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this computer-generated document has a word count of **14,533** words, based upon the representation provided by the word processing program that was used to create the document.

/s/ *Jessica Caird*

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002-1923
(713) 274-5826
TBC No. 24000608
caird_jessica@dao.hctx.net